IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2000 Session

## TONYA PETRECE RAY v. WILLIAM MARTIN RAY

**Appeal from the Circuit Court for Davidson County**
**No. 99D-662     Carol Soloman, Judge**

_____

**No. M2000-00895-COA-R3-CV - Filed October 5, 2001**

_____

This appeal involves a dispute over the custody of three-year-old twins between their biological father and the former husband of their biological mother. The biological father intervened in the divorce proceeding between the twins' mother and her husband in the Circuit Court for Davidson County seeking custody of the children. Following a bench trial, the trial court declared the parties divorced and awarded custody of the parties' two biological children to the mother's former husband. The trial court also concluded that the mother's former husband was comparatively more fit than the twins' biological father to have custody of the twins. In response to the biological father's Tenn. R. Civ. P. 59.04 motion suggesting that it had applied the wrong legal standard when it determined the custody of the twins, the trial court found that placing the twins with their biological father would expose them to a "substantial risk and danger of great harm." On this appeal, the twins' biological father takes issue with the evidentiary foundation of the trial court's refusal to grant him custody of his children. We have determined that the record does not contain clear and convincing evidence to support the trial court's conclusion that placing these children in their biological father's custody will expose them to substantial harm. Accordingly, we vacate the portion of the decree awarding custody of the twins to their biological mother's former husband.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part
and Vacated in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Clark Lee Shaw, Nashville, Tennessee (on appeal), for the appellant, Stephen Eric Staggs.

John M. L. Brown, Nashville, Tennessee, for the appellee, William M. Ray.

### OPINION

### I.

William M. Ray and Tonya P. Ray began seeing each other sometime prior to 1992. Their first child was born in October 1992. Ms. Ray was nineteen years old, and Mr. Ray was twenty-one.

They were married in Lawrenceburg on May 28, 1994, after Ms. Ray discovered that she was pregnant again. Their second child was born in October 1994. Mr. Ray held down several jobs to support the family, and Ms. Ray was the primary caregiver for the two children.

The parties' relationship was punctuated by frequent arguments and fights. They separated in early 1997, and Ms. Ray actually filed for divorce. She also began an affair with Stephen Eric Staggs whom she had met through mutual friends. Mr. Staggs had just recently received a less than honorable discharge from the Navy. He was also married to his high school sweetheart, but they were estranged, and Mr. Staggs was then living with his mother. Ms. Ray had sex with both Mr. Ray and Mr. Staggs during April 1997 and sometime in May or June, she discovered that she was pregnant.

Ms. Ray and Mr. Staggs parted company on particularly bad terms in July or August 1997. She told him that there was a chance that he was not the father, and he told her that he hated her and never wanted to see her again. Approximately six weeks later, Ms. Ray reconciled with Mr. Ray. She told him that she was pregnant with twins and that he could possibly be the father. Mr. Ray told her that he would accept the children whether they were his or not. They also decided that they should have the genetic testing performed, not to determine parentage, but for future medical purposes. However, they were advised to defer the testing until after the babies were born.

Ms. Ray gave birth to twins on December 19, 1997. They were approximately one month premature. Ms. Ray did not inform Mr. Staggs of the birth because they had not spoken to each other since they broke up. Mr. Staggs claims to have made some effort to contact Ms. Ray, but his attention was increasingly focused on Emily Catherine Moore whom he had met in late December or early January. The Rays had genetic testing performed in February 1998. However, Ms. Ray had the envelope containing the results sealed, and Mr. Ray had the sealed envelope placed in his mother's safety deposit box at the bank.

By this time, both Mr. Ray and Ms. Ray were working at the Vanderbilt Medical Group. They worked at raising the four children. Mr. Ray did not treat the twins differently from the two older children. The Rays did not discuss the parentage of the twins, but Ms. Ray's "mother's intuition" led her to believe that Mr. Staggs, not Mr. Ray, was the children's father. She did not share her belief with Mr. Ray.

By February 1999, the Rays' relationship had again deteriorated. They had a particularly ugly confrontation on February 28, 1999, apparently precipitated by a visit by Ms. Ray's sister who was living in Texas. Ms. Ray angrily told Mr. Ray that he was not the twins' father. Both parties filed petitions for protection on March 2, 1999, and Ms. Ray filed a complaint for divorce in the Circuit Court for Davidson County on March 3, 1999.[1]

---

[1]Ms. Ray alleged in her complaint that four children were born of the marriage. She corrected this misstatement in an amended petition filed on May 7, 1999, when she alleged that Mr. Ray was not the father of the twins and, therefore, that they should be placed in her custody.

Following a March 25, 1999 hearing on the petitions for protective orders, the trial court granted Mr. Ray a protective order, directed Ms. Ray to move out of the marital residence, and granted the parties shared custody of all four children with Mr. Ray as the primary physical custodian. Ms. Ray took issue with this order, and in a "motion for new trial" insisted that the trial court should not have awarded Mr. Ray primary physical custody of the twins because paternity tests had rebutted the presumption that he was their biological father. She also got word to Mr. Staggs through his grandmother that he was the biological father of the twins.

Upon receiving word from Ms. Ray about the twins, Mr. Staggs obtained his own genetic testing that confirmed that he was their biological father. In May 1999, he sought permission to intervene in the Rays' divorce proceeding and to file a complaint to establish paternity.[2] The trial court granted these motions in June 1999, and Mr. Staggs immediately requested temporary custody of the twins. Both Mr. Ray and Ms. Ray opposed his request for custody, and Mr. Ray filed a counterclaim against Mr. Staggs seeking retroactive child support. Thereafter, Mr. Staggs requested temporary visitation with the twins. The Rays also opposed this request. Following a hearing on August 6, 1999, the trial court entered an order concluding that Mr. Staggs was the twins' biological father and establishing a visitation schedule for him that enabled him to have unsupervised visits with the children for four hours on Thursday afternoons and eight hours on Saturday. The trial court denied Mr. Staggs's request for overnight visitation because he and Emily Moore were not married at the time.

At about this time, Ms. Ray became involved with a childhood friend named Richard Moss. In her words, they "went to a place where we should not have went," and Ms. Ray soon discovered that she was pregnant with Mr. Moss's child. In the meantime, Mr. Staggs and Ms. Moore decided to move up their wedding date to bolster his request for overnight visitation with the twins. Mr. Staggs and Ms. Moore were married on August 27, 1999 in a civil ceremony, and approximately two weeks later, Mr. Staggs filed a motion seeking overnight visitation. Both the Rays again opposed this motion. Approximately three months later, Mr. Staggs requested overnight visitation on November 20, 1999 to enable the twins to be present when he and his new wife conducted a "traditional wedding ceremony." On November 9, 1999, the trial court replaced Mr. Staggs's four-hour Thursday visitation with visitation from Tuesday afternoon until Wednesday morning. The trial court also permitted the overnight visitation to coincide with Mr. Staggs's and Ms. Moore's traditional wedding.

The trial court conducted a bench trial on December 9 and 10, 1999. Mr. Ray and Ms. Ray stipulated that each of them had grounds for divorce and requested that they be declared divorced in accordance with Tenn. Code Ann. § 36-4-129(b) (Supp. 2000). They also agreed on the financial aspects of their divorce. Except for these issues, the entire hearing focused on the three parties' dispute over custody of the children. While Ms. Ray conceded that Mr. Ray was a good father, she opposed awarding him custody of their two older children because his work hours were too long, and

---

[2]Mr. Staggs's litigation expenses were being underwritten by his girlfriend's father. By this time, Mr. Staggs and Emily Moore had decided to marry, and Mr. Staggs had decided that he wanted to take on the responsibility for raising the twins. Both Ms. Moore and her parents supported this decision.

she insisted that he should not receive custody of the twins because he was not their biological father. She also insisted that Mr. Staggs was completely unfit to take on the responsibilities associated with being the twins' custodial parent. For his part, Mr. Ray agreed that Ms. Ray could be a good mother when she decided to be but that she should not be awarded custody of any of the children because of her personal conduct and her demonstrated lack of attention to the children's needs. He also asserted that Mr. Staggs was not fit to have custody of the twins. Mr. Staggs asserted that he and his new wife could provide the twins with a more stable, nurturing home than either Mr. Ray or Ms. Ray could provide.

The trial court undertook to resolve the custody question by first comparing the custodial fitness of Mr. Ray with the custodial fitness of Ms. Ray. The trial court concluded that Ms. Ray was "not a fit and proper person" to have sole custody of any of her four children. Then the trial court turned to the competing custody claims of Mr. Ray and Mr. Staggs. The trial court determined that Mr. Ray was comparably more fit than Mr. Staggs to have custody of the twins even though he was not their biological father. Accordingly, the trial court granted custody of the twins to Mr. Ray because "there are no fit natural parents and . . . Mr. Ray has been the stable source to the children throughout their short lives." The trial court also determined that "[t]he emotional ties of the children to each other are so strong that separation would be detrimental to them." In addition to its custody decisions, the court directed Mr. Staggs to pay $9,906 in back child support from the date of the twins' birth and granted him four hours of supervised visitation in Mr. Ray's home every other Sunday.

Mr. Staggs hired a new lawyer who filed a Tenn. R. Civ. P. 59.04 motion to alter or amend challenging the legal and factual basis of the trial court's custody decision. Ms. Ray also filed a motion to alter or amend complaining that the trial court had awarded her less than standard visitation with the two older children and that the trial court had erred by awarding custody of the twins to Mr. Ray because he was not their biological father and because the trial court had failed to find that the twins "would suffer substantial harm if placed with either biological parent." In response to these motions, the trial court filed a "memorandum of findings and order" on April 3, 2000 stating, in part:

> In addition to those reasons enumerated in the Memorandum and Order previously filed and entered by this Court, and for some of the following reasons listed herein, this Court further finds that there is a strong likelihood of substantial harm to the minor children because of both natural parents' use of drugs, instability in relationships, the natural father's history of family mental illness, lack of father's connection with his family, anger undisputed in natural father, Mother's living with an abusive man, mother's pregnancy by another man out of wedlock, Mother's allowing children in bed with her and a man to whom she is not married, natural Father's lack of interest in trying to determine paternity until the children were almost two years old, Father's taking no part in the young children's formative years and leaving them to fend for themselves, and Father

-4-

failing to pay adequate support even after he learned he was the Father, and Mother leaving the children with a known pedofile [sic]. This Court finds that for all those reasons, it is in the best interest of the minor children that they remain with the only stable force in their life, the legal father, Mr. Ray. This Court previously found both natural parents to be unfit. This Court still declares them to be unfit even with the attorney for the natural Father, Mr. Staggs, stating in open Court that as soon as this Order is final, he intends to file another Petition for custody. This Court would not be doing her duty to leave two helpless children with unfit parent [sic] and in harm's way.

In addition to this language, the trial court wrote by hand that

This court finds by very clear and convincing proof that there is a substantial risk and danger of great harm to these children if placed with the natural parents.

Approximately one month after concluding that placing the twins with Mr. Staggs would expose them to a substantial risk of danger, the trial court permitted Mr. Staggs to have eight days of extended visitation with them for an extended vacation with the Moore family.

## II.
### THE CUSTODY OF THE TWINS

This appeal focuses on the competing custody claims of Mr. Staggs and Mr. Ray.[3] Mr. Staggs asserts that, notwithstanding the trial court's "attempt to 'pad' its initial ruling, in anticipation of this appeal," the evidence does not support the trial court's conclusion that he is unfit to have custody of his children and that giving him custody would expose them to a substantial risk of danger. We agree. The record does not contain clear and convincing evidence that, based on the circumstances existing at the time of the December 1999 trial, granting Mr. Staggs custody of his two-year-old twins would expose the children to a risk of substantial harm.

### A.

The legal standards applicable to custody disputes between a biological parent and a third party differ markedly from those applicable to custody disputes between biological parents. The comparative fitness analysis commonly associated with custody disputes between biological parents cannot be used because it fails to take into account that the custody claims of biological parents and the custody claims of third parties do not have the same legal weight. A biological parent's custody claims carry more weight than those of a third party because only biological parents have a

---

[3]Ms. Ray has not appealed either the custody or the visitation decisions, and Mr. Staggs has not taken issue with the $9,906 judgment against him for back child support.

constitutionally protected interest in raising their children.[4] *Stubblefield v. State ex rel. Fjelstad*, 171 Tenn. 580, 587-88, 106 S.W.2d 558, 561 (1937); *Doles v. Doles*, 848 S.W.2d 656, 660 (Tenn. Ct. App. 1992).

A biological parent's interest in the care, custody, and control of his or her child is among the oldest of the judicially recognized fundamental liberty interests. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). It is protected not only by the Due Process Clause of the Fourteenth Amendment, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394 (1982), but also by Tenn. Const. art. I, § 8. *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993). Accordingly, biological parents have a constitutionally protected interest in raising their children free from unwarranted state intervention. *Doe v. Sundquist*, 2 S.W.3d 919, 926 (Tenn. 1999); *In re Swanson*, 2 S.W.3d 180, 186 (Tenn. 1999); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). The Tennessee Supreme Court has extended this protection to the biological parents of nonmarital children as long as they have developed a substantial relationship with the child and have not been found to be unfit. *Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994).

Persons who are not a child's biological parent do not have the same constitutionally protected parenting interests possessed by a biological parent. Accordingly, when faced with competing custody claims by a biological parent and a third party, the courts must favor the biological parent. The courts cannot award custody to a third party instead of a biological parent unless the third party can demonstrate that the child will be exposed to substantial harm if custody is awarded to the biological parent. In other words, a biological parent cannot be denied custody unless he or she is found to be unfit.[5]

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child.[6] These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things.

---

[4] Adoptive parents have the same interests as biological parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995). Accordingly, the references to biological parents in this opinion are not intended to imply that adoptive parents do not have similar rights.

[5] The necessity of finding parental unfitness distinguishes custody disputes between biological parents and third parties from custody disputes between biological parents. The comparative fitness analysis used to resolve custody disputes between biological parents does not require a finding of parental unfitness. *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). In contrast, a court cannot favor a third party over a biological parent unless the court has determined that the biological parent is unfit. *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d at 581.

[6] This court has observed that a finding of substantial harm to a child includes "a finding of parental unfitness or of dependency and neglect of the child . . .." *Eason v. Bruce*, No. W2000-01326-COA-R3-CV, 2001 WL 502834, at *2 (Tenn. Ct. App. May 10, 2001) (No Tenn. R. App. P. 11 application filed).

First, it connotes a real hazard or danger that is not minor, trivial, or insignificant.[7]  Second, it indicates that the harm must be more than a theoretical possibility.  While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

The courts have likewise not provided clear directions regarding the amount of proof required to establish that a child will be exposed to substantial harm if he or she is placed in the custody of a biological parent rather than a third party.  Over sixty years ago, in a suit involving a custody dispute between a four-year-old child's biological father and her great-grandfather and great-uncle, the Tennessee Supreme Court held that the father's unfitness must be established by "a clear preponderance of convincing proof." *Stubblefield v. State ex rel. Fjelstad*, 171 Tenn. at 587, 106 S.W.2d at 560.  We have likewise invoked this standard of proof in other custody disputes between parents and third parties. *Moore v. Moore*, No. 03A01-9708-CH-00382, 1998 WL 758995, at *3 (Tenn. Ct. App. Oct. 30, 1998) (No Tenn. R. App. P. 11 application filed); *Henderson v. Mabry*, 838 S.W.2d 537, 540 (Tenn. Ct. App. 1992); *Dunavant v. Dunavant*, 31 Tenn. App. 634, 645, 219 S.W.2d 910, 914-15 (1949).

The reason for adopting this heightened burden of proof in custody disputes between a biological parent and a third party is the same as the reason for adopting a heightened standard in termination of parental rights cases.  The state and federal constitutions require a heightened standard because of the possible effects the proceeding might have on a biological parent's parenting rights. *O'Daniel v. Messier*, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995).  To prevent unwarranted termination or interference with a biological parent's parenting rights,[8] the grounds for judicial action must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996).  Evidence that satisfies this heightened burden of proof eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence, *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000).  It should produce in the fact-finder's mind a firm belief or conviction regarding the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188.

The "clear preponderance of convincing proof" standard traditionally associated with custody disputes between biological parents and third parties is, as a practical matter, the same as the "clear

---

[7]The Tennessee General Assembly has identified some of the circumstances that might cause substantial harm to a child.  The grounds for terminating parental rights in Tenn. Code Ann. § 36-1-113(g) (Supp. 2000) provide examples of circumstances that cause substantial harm to a child.  Other examples can be found in the parental relocation statutes [Tenn. Code Ann. § 36-6-108(d) (Supp. 2000)], the grandparent visitation statutes [Tenn. Code Ann. § 36-6-306(b)(1) (Supp. 2000)], and the statutory definition of "dependent and neglected child" in Tenn. Code Ann. § 37-1-102(b)(12) (Supp. 2000).  While these statutes are not intended to be the exclusive source for circumstances causing substantial harm to children, they provide helpful guidance to the courts.

[8]*In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *4 (Tenn. Ct. App. Sept. 6, 2001); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

and convincing evidence" standard associated with termination of parental rights cases. Accordingly, to avoid the risk of confusion between the heightened burden of proof required by this standard, and the standard of appellate review used to review cases of this sort, we will characterize the burden of proof in these cases as the "clear and convincing evidence" standard.

Because this heightened burden of proof differs from the customary burden of proof in civil cases, we must adjust the usual standard of review of factual findings found in Tenn. R. App. P. 13(d). In cases such as the one before us, we will review the trial courts specific findings of fact in accordance with Tenn. R. App. P. 13(d). Accordingly, the trial court's findings of fact will be presumed to be correct unless the evidence preponderates otherwise. Then we will determine whether the facts, as found by the trial court, clearly and convincingly establish that a child will be exposed to a risk of substantial harm if he or she is placed in a biological parent's custody. *In re L.S.W.*, 2001 WL 1013078, at *5; *In re T.L.P.*, No. W1999-01940-COA-R3-CV, 2001 WL 987152, at *2 (Tenn. Ct. App. Aug. 22, 2001).

**B.**

We now turn to the substance of the trial court's custody decision. Like any other custody decision, we recognize at the outset that trial courts have broad discretion to fashion custody arrangements that best suit the unique circumstances of each case. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). Our role is not to "tweak [these decisions] . . . in the hopes of achieving a more reasonable result than the trial court." Rather, it is to determine whether the trial court's decision "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

Custody decisions should not be used to punish parents for past misconduct or to award parents for exemplary behavior. *Rice v. Rice*, 983 S.W.2d 680, 683 (Tenn. Ct. App. 1998); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997); *Gaskill v. Gaskill*, 936 S.W.2d t 630. The courts understand that persons are able to turn their lives around, *see In re Askew*, 993 S.W.2d 1, 2 (Tenn. 1999). Accordingly, custody decisions should focus on the parties' present and anticipated circumstances, *Hall v. Hall*, No. 01A01-9310-PB-00465, 1995 WL 316255, at *2 (Tenn. Ct. App. May 25, 1995) (No Tenn. R. App. P. 11 application filed), and on the parties' current fitness to be custodians of children. *See Elder v. Elder*, No. M1998-00935-COA-R3-CV, 2001 WL 1077961, at *2 (Tenn. Ct. App. Sept. 14, 2001); *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *3 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed).

The courts may and should consider past conduct to the extent that it assists in determining a person's current parenting skills or in predicting whether a person will be capable of having custody of a child. However, the consideration of past conduct must be tempered by the realization that the persons competing for custody, like other human beings, have their own virtues and vices. *Gaskill v. Gaskill*, 936 S.W.2d at 630. Biological parents are not required to demonstrate they are perfect before they can be granted custody of their children. *Richard v. Richard*, No. M1999-02797-

COA-R3-CV, 2000 WL 679233, at *5 (Tenn. Ct. App. May 25, 2000) (No Tenn. R. App. P. 11 application filed); *Rice v. Rice*, 983 S.W.2d at 682-83.

The trial court based its decision to deny Mr. Staggs custody on eleven findings regarding (1) his efforts to develop a substantial relationship with the twins, (2) his relationship with his father and brother, (3) his personal conduct, and (4) his relationship with Mr. Ray. Despite the largely undisputed evidence that Mr. Staggs had turned over a new leaf with the help of his wife and her family, the trial court apparently decided that his transformation was too short-lived to outweigh his prior conduct.[9] We have determined that the factors relied upon by the trial court do not establish clearly and convincingly that Mr. Staggs would be an unfit parent or that placing the twins in his custody would expose them to a risk of substantial harm.

**1.**
**Mr. Staggs's Efforts to Develop a Substantial Relationship With the Twins**

Three of the trial court's reasons for finding Mr. Staggs unfit are: (1) his "lack of interest in trying to determine paternity until the children were almost two years old," (2) his "taking no part in the young children's formative years and leaving them to fend for themselves," and (3) his "failing to pay adequate support even after he learned he was the [f]ather." Each of these findings is relevant to the important threshold question regarding the nature of Mr. Staggs's relationship with the children. As the biological father of nonmarital children, Mr. Staggs will be permitted to invoke his parental rights only if he has developed a substantial relationship with his children or he has attempted in good faith to do so. *Petrosky v. Keene*, 898 S.W.2d at 728; *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 182 (Tenn. Ct. App. 2000); *In re Hood*, 930 S.W.2d 575, 578-79 (Tenn. Ct. App. 1996).

When Ms. Ray was pregnant with the twins, both Mr. Ray and Mr. Staggs knew that she had had sex with each of them. She told both of them that they could be the father. After her five-month relationship with Mr. Staggs ended, Ms. Ray returned to Mr. Ray. While they did not move from the house where Mr. Ray had been living, Mr. and Ms. Ray obtained an unlisted telephone number. Ms. Ray did not attempt to contact Mr. Staggs because "everything was going okay" with Mr. Ray. For his part, Mr. Staggs attempted to find Ms. Ray by telephone at her old telephone number, by visiting where he thought she lived, and by trying to find her through mutual friends. He was unsuccessful. As time passed without any word from Ms. Ray, Mr. Staggs assumed either that Ms. Ray had miscarried or that the children were not his.

Mr. Staggs learned in March 1999 that the twins had been born and that Ms. Ray was asserting that he was their father. He promptly sought genetic testing in April 1999 and moved to intervene in the Rays' pending divorce proceeding one month later after the tests confirmed that he was the twins' biological father. He has been exercising unsupervised visitation with the children

_____

[9]The trial court noted in its first memorandum opinion that "Mr. [Staggs] has only been stable for a three month period." We assume that the trial court was referring to the period of time following Mr. Staggs's marriage in August 1999.

since August 1999. While he expressed some reluctance about paying retroactive child support, the record contains no evidence that Mr. Staggs has refused to comply with any court order regarding support or visitation.

When Mr. Staggs first sought to intervene in this case in May 1999, he had virtually no contact with the children. At that point, there may have been a substantial question regarding whether he was entitled to invoke his rights as a biological parent either because he did not have a substantial relationship with the children or because he had not made good faith efforts to establish a substantial relationship. However, as a result of the trial court's decision to give Mr. Staggs visitation rights, he had developed a relationship with the children by the time of the trial in December 1999. The trial court has not found that Mr. Staggs's relationship with the twins is insubstantial and, in fact, has reinforced the relationship by granting Mr. Staggs continuing visitation rights. In light of these developments, the record does not contain clear and convincing evidence that Mr. Staggs does not presently have a substantial relationship with the children. Accordingly, the trial court erred by basing its custody decision on Mr. Staggs's efforts, or lack of efforts, to develop a substantial relationship with the parties' children prior to March 1999.[10]

**2.**
**Mr. Staggs's Relationship With His Family**

The trial court also decided that Mr. Staggs would be an unfit parent because of (1) the "history of family mental illness" and (2) his "lack of . . . connection with his family." It is unclear precisely how either of these factors reflects on Mr. Staggs's fitness because the record contains no evidence that he exhibits any sign of mental illness or that his estranged relationship with his father and brother colors his parenting ability.

Mr. Staggs was extremely close to his mother; so close that he sought an early discharge from the Navy to be with her when she fell ill. His father and one of his brothers are mentally ill, and Mr. Staggs has been estranged from them for some time because he views them, with some cause, as negative influences in his life. He maintains a close relationship with another brother and his family and with his grandparents, a cousin, and an uncle. Without more, this sort of family estrangement does not provide clear and convincing evidence that placing Mr. Staggs's children in his custody will expose them to substantial harm.

**3.**
**Mr. Staggs's Personal Conduct**

The trial court also based its custody decision on (1) Mr. Staggs's admitted use of illegal drugs, (2) his smoking, (3) his anger, (4) his "instability in relationships," and (5) his decision to live with his present wife before they were married. All of these matters are relevant to a custody

---

[10]The evidence likewise does not establish clearly and convincingly that Mr. Staggs's efforts prior to March 1999 to establish his relationship with the twins were unreasonable or not in good faith.

determination. However, the evidence regarding each of these matters indicates that they do not currently undermine Mr. Staggs's fitness to have custody of his children.

By the end of its consideration of the case, the trial court had received undisputed evidence (1) that Mr. Staggs had not used marijuana or any other illegal drug since the spring of 1997, (2) that he had married his fiancée in August 1999, and (3) that he and his new wife had stopped smoking because they understood that smoking aggravated the children's eczema and asthma. Accordingly, the evidence of this past problematic conduct does not demonstrate clearly and convincingly that placing the children in Mr. Staggs's custody would presently expose them to substantial harm.

The remaining two matters singled out by the trial court were Mr. Staggs's "anger" and the "instability" in his relationships. The fact that Mr. Staggs had been married twice by the time he was twenty-five years old reflects on his maturity when he married his high school sweetheart while stationed overseas in the Navy. However, it sheds little light on Mr. Staggs's current maturity or the stability of his current marriage.

Likewise, the evidence of Mr. Staggs's "anger" is anecdotal and unremarkable. It appears to involve only two circumstances. The first was a single incident when Mr. Staggs purportedly grabbed his four-year-old nephew's arm and yelled at him while placing him in time out. The second is Ms. Ray's observation that Mr. Staggs was, at times, "stern" with her two older children while they were living together in 1997. These incidents are not evidence of a continuing course of conduct that reflects on Mr. Staggs's ability to deal with small children. These incidents are de minimis and are certainly not inconsistent with the conduct one might expect from a 25-year-old male finding himself in a predicament like the one in which Mr. Staggs found himself in 1997. The parties' circumstances in 1999 are far different from those in 1997, and accordingly Mr. Staggs's behavior in 1997 does not appear to be an accurate predictor of his behavior in 1999 and thereafter.

The evidence presented at the December 1999 hearing regarding Mr. Staggs does not clearly and convincingly depict a person who would be an unfit parent. By the time of the hearing, Mr. Staggs had held a well-paying job for over eighteen months and had earned the trust and respect of his employer. He also been married to a woman he had been dating for approximately eighteen months, and he had been fully integrated into her family. He had earned the admiration and respect of his wife's parents for his honesty and tenacity. He had also gained experience with young children and was serving as a volunteer coach for a YMCA youth basketball program. In light of this evidence, we find that the trial court placed undue weight on Mr. Staggs's past conduct rather than on his current fitness to have custody of his children.

**4.**
**Mr. Staggs's Relationship With Mr. Ray**

As a final matter, the trial court based its decision that Mr. Staggs is unfit to have custody of his children on his candid admission that he did not desire Mr. Ray to play a continuing role in the children's lives. The trial court viewed this attitude as contrary to the children's best interests. While that may very well be true, Mr. Staggs's attitude is not unique to this case. It is a common,

albeit regrettable, part of custody disputes not only between a biological parent and a third party but also between biological parents.

Neither Mr. Ray nor Mr. Staggs attempted to conceal their dislike for each other. Their attitudes most likely stem from their competition for Ms. Ray's favors in 1997. Mr. Ray, rendered a cuckold by Mr. Staggs, carried the battle to his wife's lover at every turn. After the trial court permitted Mr. Staggs to intervene in this proceeding, Mr. Ray vigorously opposed all of Mr. Staggs's efforts to obtain custody and even visitation with the twins. The relations between the two men became so strained that Mr. Staggs's lawyer and father-in-law advised him to avoid having any direct dealings with Mr. Ray. Accordingly, to keep tensions in check, Mr. Staggs's wife dealt with Mr. Ray on most visitation matters.

One of the inevitable consequences of a custody decision is that the custodial parent receives control over his or her children's relationship with others. While a custodial parent cannot interfere with a child's relationship with his or her other biological parent, he or she may restrict or even prevent third parties, even grandparents and other family members, from maintaining a relationship with the children. The courts cannot interfere or abridge this custodial prerogative without a compelling reason. *See Nash-Putnam v. McCloud*, 921 S.W.2d at 175; *Nale v. Robertson*, 871 S.W.2d at 678; *State ex rel. Cihlar v. Crawford*, 39 S.W.3d at 182.

In cases of this sort, a biological parent's expressed intention regarding how he or she intends to exercise his or her parental prerogatives is relevant to the question of custodial fitness. However, these intentions take on controlling significance only when the record contains evidence that exercising the parental rights in the intended manner will cause substantial harm to the child.

Mr. Staggs's expressed intention to deny Mr. Ray continuing visitation with the children could conceivably harm the children in two ways. First, the children might be emotionally harmed by being separated from the most significant male figure they have had in their young lives. Second, they could be harmed by being separated from their siblings. We can only speculate about the nature, extent, and duration of the harm that might befall the twins if they are separated from Mr. Ray and their siblings because the record contains no evidence, expert or otherwise, regarding what the possible effects of placing the children in Mr. Staggs's custody might be. As a general matter, clear and convincing evidence of the sort of psychological harm that would be severe enough to justify denying custody to a biological parent should take the form of expert testimony. Accordingly, we conclude that the present record lacks clear and convincing evidence that the children will be substantially harmed if Mr. Staggs decides not to permit Mr. Ray to visit them.

Similarly, the record does not contain clear and convincing evidence that the twins will be substantially harmed if they are separated from their older siblings. While the record contains evidence that Ms. Ray's four children have bonded and that they get along well with each other, it contains no evidence regarding the reasonably anticipated effects that separating the children might have. To influence custody decisions in cases like this one, the presumption against separating

siblings[11] will not suffice. Before custody can be denied a biological parent on the ground that children will be separated from their half-siblings, there must be clear and convincing evidence that the separation will cause the children severe psychological harm.

Mr. Staggs has not said that he will not permit the twins to continue their relationship with their older half-sisters. Thus, the concerns about the effects of separating the twins from their siblings can be addressed by fashioning transitional orders and visitation orders designed to minimize the impact of moving the children from one environment to another and to enable the children to continue their relationship with their siblings. *Rice v. Rice*, 983 S.W.2d at 685 (permitting the use of visitation orders to promote the continuation of the relationship between half-siblings). Neither the constitution nor common sense requires that the transition be abrupt. Accordingly, when justified by the facts, courts may fashion a procedure for returning children to a biological parent that minimizes the harm that the transition itself might cause to the child. These transitional arrangements may include provisions enabling the children to maintain their relationship with their siblings.[12]

### III.

We vacate the portions of the January 12, 2000 and April 3, 2000 orders denying Mr. Staggs's petition for custody of his biological children and remand the case to the trial court with directions to conduct a hearing consistent with this opinion to determine whether Mr. Staggs is currently fit to have custody of his children and whether granting Mr. Staggs custody will expose his children to substantial harm. Pending this hearing, the trial court shall prescribe appropriate visitation for Mr. Staggs and his children. The costs of this appeal are taxed in equal proportions to Stephen Eric Staggs and his surety and William Martin Ray for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[11]*Baggett v. Baggett*, 512 S.W.2d 292, 293-94 (Tenn. Ct. App. 1973). This presumption is not inflexible and must give way to other considerations in appropriate circumstances. *Rice v. Rice*, 983 S.W.2d at 684. The fact that children are half-siblings may provide a basis for disregarding the presumption.

[12]Maintaining a child's relationship with his or her siblings may, of necessity, include the involvement of the custodians of all the children. For example, a court could decide that maintaining the relationship among siblings requires permitting a child to visit in his or her sibling's home under the supervision of that sibling's parent.