IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 24, 2012 Session

# IN RE: HANNAH V. S.

**Appeal from the Circuit Court for Rutherford County**
**No. 58036      J. Mark Rogers, Judge**

**No. M2011-01557-COA-R3-CV - Filed December 7, 2012**

The mother of a sixteen month-old girl left the child in the care of the child's grandparents. The grandparents subsequently filed a dependency and neglect petition, and the court found that the child was dependent and neglected and granted temporary custody to the grandparents. They continued to raise the little girl without any assistance from the mother. Almost eight years later, the mother petitioned the court to restore custody of the child to her. Proceedings in the Juvenile Court followed, with an appeal to the Circuit Court, which determined that the child was dependent and neglected because changing custody to the mother would expose her to a risk of substantial harm. It also found that it was in Hannah's best interest that custody remain with the grandparents. The appropriate standard for the mother's request for modification of the order giving temporary custody to non-parents is whether the non-parents demonstrated by clear and convincing evidence the existence of a substantial risk of harm to the child if custody were granted to the parent. Based upon our review of the record, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Luke Austin Evans, James Thomas Pinson, Murfreesboro, Tennessee, for the appellant, Shannon L. G.

Daryl Miller South, Brandon Michael Booten, Murfreesboro, Tennessee, for the appellees, J. M. G. And T. W. G.

## OPINION

### I. BACKGROUND

The child at the center of this case, Hannah V.S., was born on May 14, 1997, to Shannon G. ("Mother"). After two years of difficulty in achieving the stability needed to raise a child, Mother voluntarily placed the child in the care of her father, J.M.G., and her stepmother, T.W.G. (collectively "Grandparents") .

On November 9, 1999, Grandparents filed a dependency and neglect petition in the Juvenile Court of Rutherford County, in part to obtain the legal standing required to provide Hannah with medical insurance and necessary educational services. By order filed November 20, 1999, the court found the child to be dependent and neglected, and it awarded Grandparents temporary custody and guardianship of Hannah, with Mother to receive supervised visitation. Mother was also ordered to complete parenting classes and to pay child support of $25 per week.

No further legal action occurred for the next eight years. The appeal before us arises from proceedings initiated in 2007 by Mother's filing in the Juvenile Court a petition to regain custody of Hannah.[1] The Juvenile Court found Hannah to be a dependent and neglected child and re-affirmed Hannah's placement in the joint custodial care of Grandparents. Mother filed an appeal to the Circuit Court of Rutherford County.[2]

After *de novo* review proceedings, the court found there was clear and convincing evidence that Hannah was dependent and neglected. The court explicitly relied on a

---

[1]Although the petition itself does not appear in the appellate record, we can glean from references to it the nature of the petition. According to statements by the trial court and this court in the first appeal, Mother filed a petition alleging a material change of circumstances, *i.e.*, Grandparents were divorcing, and the child would no longer be living with the both of them. Mother alleged that it was in the child's best interest for Mother to regain full custody rights. Alternatively, she sought liberal visitation rights. Each Grandparent had, indeed, filed earlier petitions for custody of Hannah because they were seeking a divorce. However, they reconciled, their divorce complaint was dismissed, and their petitions filed herein were dismissed.

[2]The Circuit Court initially dismissed the appeal, holding that the determination of dependency and neglect from the adjudicatory hearing was not appealable because the notice of appeal was not filed within ten days of the order resulting from that proceeding. Upon Mother's application, this court granted interlocutory appeal. We held that Mother's timely appeal of the order resulting from the dispositional hearing was timely so as to raise issues from both the adjudicatory and the dispositional hearings. We accordingly reversed and remanded the case for a determination on the petitions. *In re Hannah S.*, 324 S.W.3d 520 (Tenn. Ct. App. 2010).

definition of a "dependent and neglected child" as one "[w]ho is suffering from abuse or neglect," Tenn. Code Ann. § 37-1-102(b)(12)(G), and on the definition of abuse found at Tenn. Code Ann. § 37-1-102 (b)(1): "Abuse" exists when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker.

## II. PROCEEDINGS IN CIRCUIT COURT

An appeal from a judgment in a dependency and neglect proceeding is made to the circuit court, which is to try the case *de novo*. Tenn.Code Ann. § 37-1-103(a)(1). That includes an appeal of a custody decision that is made during a dependency and neglect proceeding. *In re D.Y.H.*, 226 S.W.3d 327, 331 (Tenn. 2007). As our Supreme Court has explained, ". . . a subsequent decision by the juvenile court on whether to modify an initial custody order will also arise from and be a part of the neglect and dependency proceeding" and, therefore, appealed to the circuit court for *de novo* review.[3] *Id*. at 331-32.

Herein, the parties stipulated that it would be proper to approach the proceedings on Mother's petition as an extension of the 1999 dependent and neglect proceedings in juvenile court that had resulted in Hannah being adjudicated dependent and neglected and in Grandparents being awarded temporary custody and guardianship of Hannah. The parties also agreed that the hearing would be bifurcated, with an adjudicatory and dispositional phase.[4]

---

[3]While the record of the juvenile court proceedings is required to be provided to the circuit court on appeal, Tenn. Code Ann. § 37-1-159(c), the circuit court is not limited to that record. On the contrary, the circuit court in a dependency and neglect proceeding may not rely solely on the record made before the juvenile court, but under Tenn. Code Ann. § 37-1-159(c) must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. *Tennessee Dept. of Children's Services v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006); *In re M.J.B.*, 140 S.W.3d at 651; *In re M.E.*, M2003-00859-COA-R3-PT, 2004 WL 1838179, at *5 (Tenn. Ct. App., August 16, 2004) (perm. app. denied Nov. 8, 2004). Black's Law Dictionary defines a *de novo* trial as "[a] new trial on the entire case - that is, on both questions of fact and issues of law - conducted as if there had been no trial in the first instance." *Kissick v. Kallaher*, W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006) (no Tenn. R. App. P. 11 application filed). Consequently, the circuit court is not "reviewing" the juvenile court's decision; instead, it is conducting a new proceeding as though the petition were originally filed in circuit court.

[4]In an initial dependency and neglect petition, the juvenile court must first hold an adjudicatory hearing and make and file its findings as to whether the child is a dependent or neglected child. If the court finds that the child is not a dependent or neglected child, it is to dismiss the petition. Tenn. Code Ann. § 37-
(continued...)

-3-

The trial court noted in its adjudication order that, since this was a *de novo* review in a dependency and neglect proceeding, the burden was on the Grandparents to establish by clear and convincing evidence that Hannah was a dependent and neglected child. In his opening statement, the attorney for Grandparents stated it was their burden to show that if Hannah were removed from the Grandparents' home she would suffer substantial emotional and mental harm. The attorney for Mother described the case as a dependent and neglect between a parent and a non-parent and stated, "unless there is substantial harm, the court must return the child to the mother in this case." He also stated that Mother expected a bifurcated proceeding, with the adjudicatory phase first.

It is not clear to us why the parties and the trial court concluded that a new adjudicatory hearing was necessary on Mother's 2007 petition.[5] It does not appear that anyone alleged that Hannah was dependent and neglected in 2007. Since she was then, and had been, receiving care that met her needs in a stable and nurturing environment with the Grandparents, such an allegation would have been without foundation. Instead, Mother's petition sought a change of custody to Mother.

Once the juvenile court found in 1999 that Hannah was a dependent and neglected child, it obtained continuing jurisdiction over the child. Tenn. Code Ann. § 37-1-103(c). That jurisdiction continues until one of the following four events: (1) the petition is dismissed, (2) the case is transferred, (3) an adoption petition is filed, or (4) the child reaches 18. *Id*. *In re D.H.Y.*, 226 S.W.3d at 330. Accordingly, the juvenile court, and the circuit court on appeal, had jurisdiction to determine the best custody arrangement for Hannah without the necessity of a new petition for dependency and neglect.

A parent's request for modification of a custody arrangement that resulted from a finding of dependency and neglect does not require a redetermination of whether the child is dependent and neglected. The issue is a custody decision "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a). *See, e.g.,*

---

[4](...continued)
1-129(a)(1). On the other hand, if the juvenile court finds the child to be dependent and neglected by clear and convincing evidence, then the juvenile court is to proceed to make "a proper disposition in the case." Tenn. Code Ann. § 37-1-129(c). Making a "proper disposition" requires the court to make a custody decision "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a).

[5]The court indicated that the portion of the definition that applied in this case was that the child "may be in immediate danger of suffering from . . . a mental condition . . . caused by . . . neglect or other actions or inactions of a parent." The court later filed a supplemental adjudication order to clarify that "there was **not** a finding of severe child abuse pursuant to statute." (emphasis in original order).

-4-

*In re D.Y.H.*, 226 S.W.3d 327; *Lokey v. Griffin*, 45 Tenn. App. 236, 322 S.W.2d 239 (1958).

Nevertheless, the approach taken herein by the court and the parties resulted in the application of a standard that is the same as that applicable to modification proceedings involving a parent and non-parents. After the adjudicatory hearing, the court found, by clear and convincing evidence, that Hannah was a dependent and neglected child as defined by portions of the definitional statutes. A "dependent and neglected child" includes one "[w]ho is suffering from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(12)(G). The trial court then used portions of the definition of abuse, *i.e.*, the child "may be in immediate danger of suffering from . . . a mental condition . . . caused by . . . neglect or other actions or inactions of a parent." Tenn. Code Ann. § 37-1-102 (b)(1)(18). In other words, the trial court found that returning Hannah to her mother would result in harm to Hannah, which constituted dependency and neglect.

A similar standard applies in cases where a parent seeks to modify a custody order that gave custody to a non-parent. Where, as here, the initial order grants only temporary custody to the non-parents, the parent is entitled to invoke the doctrine of superior rights.[6] *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn. 2007). In such cases, the non-parent has the burden of proving, by clear and convincing evidence, the existence of a substantial risk of harm to the child if custody were granted to the parent. *Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995). A petition to obtain custody can be denied by the trial court upon a finding of a risk of substantial harm to the child, and the non-parent has the burden to demonstrate a risk of substantial harm by clear and convincing evidence. *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *Sharp v. Stevenson*, 2010 WL 786006, at *6 (Tenn. Ct. App. March 10, 2010).

Accordingly, in the case before us, Mother was entitled to the presumptions associated with superior parental rights, and Grandparents had the burden of showing, by clear and convincing evidence, that Hannah will be exposed to substantial harm if she is placed in the custody of Mother. *In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999); *Hall v. Bookout*, 87 S.W.3d 80, 86 (Tenn. Ct. App. 2002). This is essentially the test that was applied by the trial court

---

[6]The fact that the original order was only temporary is one of the "extraordinary circumstances" that allows a parent to assert his or her superior parental rights in a proceeding to modify an order granting custody to a non-parent. *Blair v. Badenhope*, 77 S.W.3d at 148. Absent such a circumstance, the parent's petition for modification would be determined by application of the standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred which makes a change in custody in the child's best interests. *Id.; In re Adoption of A.M.H.*, 215 S.W.3d 793, 811 (Tenn. 2007).

to determine if Hannah was a dependent and neglected child, *i.e.*, that returning Hannah to her mother would result in harm to Hannah.

A risk that a child will suffer substantial harm can occur in many circumstances, and the courts have not defined all of them. However, the term "substantial . . . connotes a real hazard or danger that is not minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d at 732 . The term also "indicates that the harm must be more than a theoretical possibility." *Id*. Although it "need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id*.

### III. THE PROOF PRESENTED

In this appeal, Mother first argues that the trial court erred in finding that Hannah was in danger of suffering from a mental condition due to Mother's actions or inactions if Hannah was placed in Mother's custody. Mother asserts that the trial court's finding of dependency and neglect necessarily included a finding that there was a risk of substantial harm to Hannah if custody were awarded to Mother and that such a risk was not proved by admissible clear and convincing evidence. Accordingly, we will review the evidence presented at the hearings.[7]

Dr. Murphy Thomas, a clinical psychologist, was stipulated to be a recognized expert in his field. Grandparents had retained Dr. Thomas in 2009 to evaluate Hannah and themselves. Dr. Thomas testified that under the terms of his engagement, he was to make his evaluations on an impartial, professional basis, and that he had no preconceived notions as to what he might find or what might be determined.

Dr. Thomas further testified that he met with Grandparents and Hannah multiple times and conducted "a fairly standard mental status exam." He also obtained histories, Hannah's school records and psychological evaluations prepared by the school system. He consulted with two of Hannah's other caregivers, and administered a variety of psychological tests. He also reviewed Mother's deposition, and tried, but was unable, to obtain her cooperation for further investigation.

Dr. Thomas noted that Hannah considers Grandparents to be her Mother and Father and that she relies heavily upon them for emotional support. She knows that Mother is her

---

[7]Although the evidence was taken at two separate hearings, we will review the totality of the evidence presented because the relevant inquiry is whether there was clear and convincing evidence that there was a risk of substantial harm to Hannah if the existing custody order were modified as requested by Mother.

biological parent, but does not have a close relationship with her. She calls Grandparents "Mom" and "Dad." She calls Mother by her first name. When the child visits Mother's house, she focuses her attention and her energy on Mother's three younger children, taking on the role of their caretaker and older sister and does not interact with Mother very much.

In discussing the bonds between Hannah and her closest relatives, Dr. Thomas responded to questions by characterizing Hannah's attachment to Grandparents as a "secure attachment" and her attachment to Mother as an "insecure avoidant attachment."[8]

Dr. Thomas stated that Hannah's reliance for emotional support upon her secure attachment with Grandparents was especially pronounced in view of the special needs arising from her limited intellectual capacity, dyslexia and visual problems. He testified that a change of caretakers would likely have a devastating effect on Hannah, especially because of her special needs and her prepubescent age, could lead to self-destructive behavior and would seriously impede her transition to adult responsibilities. The possible dangers cited by Dr. Thomas included grief, depression, poor self concept, risky behavior including sexual, alcohol and drug abuse, and suicide. Under questioning, he concluded "upon a reasonable degree of professional certainty that if Hannah were placed in Mother's custody, it would place her at a very high risk of substantial harm."

Cindy Johnson, a certified licensed early childhood educator with specialized training in dealing with special needs children, testified that Grandparents had retained her to tutor Hannah beginning in the summer before sixth grade, that she and Hannah had developed a close bond, and that the child confided in her during their weekly meetings. She also testified that Hannah is an emotionally immature child with significant learning disabilities, but that Grandparents had furnished appropriate and proper care for her special emotional and intellectual needs. She also described symptoms of emotional anxiety, including problematic behavior that Hannah showed whenever discussing Mother or the possibility of living with Mother.

There was conflicting testimony as to the degree of Mother's involvement with Hannah in the years before she filed her petition to have custody modified. Grandmother, T.M.G., testified that Mother did not attempt to see Hannah for months at a time after Grandparents assumed custody. She asserted that Mother was always welcome at Grandparents' home and was always invited to birthday parties and holiday gatherings, but that Mother only attended Hannah's third birthday party. She also testified that Grandparents never did anything to prevent Mother from visiting with Hannah or contacting her, but rather

---

[8]This was in response to questions regarding a body of research related to the so-called "attachment theory."

that they tried to promote the relationship, including by offering Mother rides and gas money to make visitation easier. Mother testified to the contrary that Grandparents did not always take her phone calls and that they sometimes imposed conditions on visitation that she found difficult to satisfy.

Mother's mother acknowledged that Mother had made some irresponsible choices back in 1999, but asserted that she had matured since then, and was now a good mother to her other three children, who appeared to be healthy and happy. She also testified that Mother saw Hannah "regularly" after 1999, around ten or twelve times a year. Much of that visitation occurred in Mother's mother's house, after she drove to Grandparents' house to pick the child up. Mother's mother conceded, however, that Mother did not fully utilize her visitation time with Hannah. After the filing of Mother's petition in 2007, Hannah's visitation with Mother increased to one or two weekends a month.

Mother herself admitted that she had been irresponsible in the past, but testified that she had turned her life around since then. She has held a full-time job since 2003. Her supervisor confirmed that fact and testified that she was a dependable employee. She is now married and is raising the two children she had with her first husband and the one child she has with her current husband. She acknowledged that she has never sought child support from her former husband or from Hannah's father, even though her child support arrearage to Grandparents had reached over $20,000 by the time of the hearing.

Mother admitted under cross-examination that despite the rights granted to her in the Juvenile Court's 2008 order she had little involvement in Hannah's schooling or medical care. She declared, however, that she did not expect there to be any problems if the court granted her custody. Mother showed herself to be largely unaware of Hannah's special needs, even though the child's learning problems were first discovered when she was in the first grade. Further, Mother did not know the names of the schools Hannah attended or the names of her teacher, her pediatrician, or of any of her other healthcare providers. She did not know that Hannah had been regularly seeing a tutor, and she had never attended any of Hannah's Individualized Educational Plan meetings, where parents and professionals work together to fashion an educational plan for a special needs student.

In the dispositional hearing, Mother stated that in the months since the adjudicatory hearing, she had contacted Hannah's doctors and her school and had talked to the guidance counselor at the school closest to her own home, which Hannah would likely attend if Mother were awarded custody.

## IV. THE TRIAL COURT'S FINDINGS AND OUR STANDARD OF REVIEW

In its ruling, the trial court discussed Hannah's special needs and the excellent care that Grandparents were providing to address those needs, Mother's long history of minimal contact with the child, and Mother's unawareness of Hannah's current circumstances. Turning to the testimony of Dr. Thomas, the court cited his use of attachment theory to explain the risk of harm Hannah would face if Mother were to regain custody of her. But the court also stated that the evidence showed there was danger of mental harm arising from Mother's neglectful conduct "separate and apart from any attachment theory." The court also declared that it found that Grandparents were credible when they testified that they did not try to discourage the relationship between Hannah and Mother and that Mother's testimony to the contrary was not credible.

The court accordingly declared that there was clear and convincing evidence that Hannah was dependent and neglected. The court explicitly held that the proof established the specific definition that the child "may be in immediate danger of suffering from . . . a mental condition . . . caused by . . . neglect or other actions or inactions of a parent." Tenn. Code Ann. § 37-1-102 (b)(1); Tenn. Code Ann. § 37-1-102(b)(12)(G). After the dispositional hearing, the trial court found that it was in Hannah's best interest that Grandparents continue to exercise primary custody over her, and that they be responsible for all major decisions involving the child.[9]

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's findings of facts, and we must affirm those findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Whether the facts found by the trial court are sufficient to establish a statutory standard by clear and convincing evidence is a question of law, which this court reviews *de novo* with no presumption of correctness. *Ray v. Ray*, 83 S.W.3d at 733; *In re A.T.P.*, M2006-02697-COA-R3-JV, 2008 WL 115538 (Tenn. Ct. App. Jan. 10, 2008) (citing *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). Clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

---

[9]The court also found that it was in Hannah's best interest that she continue to have a relationship with Mother. The court accordingly entered an Order of Disposition that included a parenting plan that allowed Mother to exercise visitation with Hannah every other weekend from Friday until Sunday, as well as alternating Fall and Spring breaks and thirty days during the summer.

The appropriate question here is whether Grandparents established by clear and convincing evidence that "there is substantial harm threatening [Hannah's] welfare if [she] returns to [Mother]. *In re Adoption of A.M.H.*, 215 S.W.3d at 812.

## V. ANALYSIS

Having reviewed the record in this case, we find that the evidence does not preponderate against the trial court's findings of fact. The trial court found that there was overwhelming evidence that Hannah had special needs which Grandparents were doing an excellent job of addressing and that Mother was unaware or indifferent to those needs. Additionally, we agree with the trial court's conclusion that Grandparents established by clear and convincing evidence that Hannah would face a risk of substantial harm if her custody were awarded to Mother.

The trial court heard extensive testimony about Hannah's educational and developmental needs from Grandparents, from Dr. Thomas, and from the child's tutor. Hannah's school records were also admitted into evidence as exhibits. The proof showed that the child suffered from limited intellectual capacity, dyslexia, and visual problems and that Grandparents were helping her to overcome the difficulties arising from those problems through their personal involvement and by procuring professional assistance. Mother did not offer any evidence to the contrary. Her testimony during the adjudicatory hearing demonstrated, rather, that she was unaware of her child's needs, did not know the names of any of her teachers, did not know she had a tutor, and did not even know what school she went to.

In another case involving a mother's attempt to gain custody of her child with special needs from grandparents who had taken care of the child under a temporary custody order, this court held, "In determining whether substantial harm would result to the children from an award of custody to Mother, the trial court can and should take into account the special needs of the children and Mother's ability to meet those special needs." *Dean v. Compton*, M1998-00052-COA-R3-CV, 2000 WL 329351, at *17 (Tenn. Ct. App. Mar. 30, 2000) (no Tenn. R. App. P. 11 application filed) (citing *Gaskill v. Gaskill*, 936 S.W.2d 626 (Tenn. Ct. App. 1996)).

The trial court in this case found that Grandparents did nothing to prevent Mother from exercising visitation, but rather encouraged it, and that Mother did not take the fullest advantage of the visitation that was offered. Mother disputed this finding, but the court found her not to be a credible witness. When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, we must give considerable deference to the trial court's factual findings. *Seals v. England/Corsair*

*Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999); *Duncan v. Duncan*, 686 S.W.2d 568, 571 (Tenn. Ct. App. 1984).

In additional to generally arguing that the evidence did not rise to the "clear and convincing" level, Mother particularly objects to the testimony of Dr. Thomas, contending that most of his testimony should not have been considered by the trial court. Mother bases that argument almost entirely upon her reading of the Tennessee Supreme Court's decision in *In Re Adoption of A.M.H.*, *supra*.

In that case, where parents sought the return of their child from foster parents, the Supreme Court held that the foster parents had not proved a risk of substantial harm and stated:

> Here, the only evidence of substantial harm arises from the delay caused by the protracted litigation and the failure of the court system to protect the parent-child relationship throughout the proceedings. **Evidence that A.M.H. will be harmed from a change in custody because she has lived and bonded with the Bakers cannot constitute the substantial harm required to prevent the parents from regaining custody.** We have previously rejected the contention that when a child has been in the custody of a non-parent for a significant period of time, a lesser standard may be applied in determining whether parental rights may be terminated. *In re Swanson*, 2 S.W.3d at 188 n. 13. "Such a standard would increase the likelihood for delaying cases in order that the child remain" in the custody of the non-parent. *Id*. The same reasoning applies in this situation. (emphasis added).

*In Re Adoption of A.M.H.*, 215 S.W.3d at 812.

Mother seizes on the language highlighted above to argue that the trial court erred because it based its determination of risk of substantial harm to Hannah solely on the child's bonds with Grandparents. She also argues that the trial court was not entitled to rely on the testimony about that harm offered by Dr. Thomas because of the Supreme Court's apparent rejection of the trial court's reliance on the psychologist's opinion in *A.M.H.*

We disagree with both propositions. First, it is clear from the trial court's findings that it considered all the facts and circumstances involved in Hannah's custody. The fact that this now-15-year-old girl had bonded with Grandparents is certainly not surprising and is one of the facts relevant herein. However, it is not the determinative fact, and the trial court did not

rely on it as the primary reason for its ruling.

With regard to Mother's argument regarding the holding in *A.M.H.*, we disagree with her characterization of that holding as a rejection of "the attachment theory." It was simply, as set out above, a recognition that most children will have bonded with their non-parent caretakers and that a parent's attempts to regain custody would always be thwarted if the breaking of that bond, in and of itself, were found to constitute substantial harm.

Additionally, the differences in the facts of this case and A.M.H. are great and significant to this issue. A.M.H. was the infant daughter of Chinese citizens who were studying in the United States. The parents agreed to temporarily place the child with foster parents. Friction developed, with the biological parents asking for more opportunities to bond with their child and the foster parents withholding such opportunities. A lengthy course of legal proceedings followed, and the foster parents filed a petition for termination of parental rights and adoption. The court appointed a psychologist to evaluate the child and the parties.

In *A.M.H.*, the psychologist did not evaluate the parents or the child as ordered by the court, but he did monitor a video of a session during which the biological parents were allowed to see their daughter for the first time in two-and-a-half years. The video showed that the child did not react to her parents as parental figures. The psychologist's report stated that the child considered the foster parents to be her real parents and that the child, or a child in general, who experiences a loss in early childhood is at greater risk of developing serious psychological disorders. He also testified at trial that "I did assume that there was very little attachment to the [parents] based upon the information that I had and based also on my knowledge of psychological development."

By contrast, in the case before us, Dr. Thomas based his detailed testimony about Hannah's special needs and her relationship with Grandparents on multiple interviews, psychological testing, and examination of school records. While the psychologist in *A.M.H.* relied solely on his video observations of a single encounter between the biological parents and the child and on his general knowledge of basic psychological principles, Dr. Thomas relied on much more extensive knowledge of Hannah and her situation.

The trial court herein specifically stated that the evidence showed there was a danger of mental harm to Hannah if she were returned to Mother's custody "separate and apart from any attachment theory." We agree and have no reason to believe that the trial court based its decision primarily on Dr. Thomas's description of Hannah's bond with her Grandparents. We also conclude, however, that the expert testimony herein did not run afoul of any directive of the Supreme Court.

## VI. REUNIFICATION AND REASONABLE EFFORTS TO REUNITE

Mother's final issue on appeal is a challenge to the parenting plan adopted by the trial court after the dispositional hearing. She contends that the plan is deficient because, even though it includes generous provisions for visitation, it does not state that its primary goal is family reunification, nor does it set out a plan for Hannah's custody to be returned to her. Mother bases her argument on the provisions of Tenn. Code Ann. § 37-1-166, which reads in relevant part,

> (a) At any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall first determine whether reasonable efforts have been made to:
>
> (1) Prevent the need for removal of the child from such child's family; or
>
> (2) Make it possible for the child to return home.

By its terms, this statute specifically refers only to those situations where DCS is involved with the custody of a child. DCS is not now, and has never been, involved in the case before us. Accordingly, the trial court was under no obligation to direct that Grandparents or DCS use reasonable efforts to provide Mother with services or otherwise to make it possible for Hannah to return to Mother's custody. Neither was the trial court required to create permanency plans that "include a statement of responsibilities between the parent, the agency and the case worker for such agency" and/or that establishes a goal of reunification. Tenn. Code Ann. § 37-2-403(a)(2)(A).

Mother urges us to hold that the same goals and standards should apply to Grandparents and other custodial non-parents as applies to DCS and private foster care agencies. However, this court has rejected the proposition that reunification efforts should take the first priority in private cases where the state is not involved. *In re T.B.H.,* M2006-01232-COA-R3-JV, 2007 WL 1202411 (Tenn. Ct. App. Apr. 20, 2007) (citing *Blair v. Badenhope* 77 S.W.3d at 148). We accordingly hold that Mother's argument is without merit.

## VII. CONCLUSION

We affirm the judgment of the trial court. Remand this case to the Circuit Court of Rutherford County for any further proceedings necessary. Tax the costs on appeal to the appellant, S. G.

_____
PATRICIA J. COTTRELL, JUDGE