IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 15, 2005 Session

## BRETT W. WOODROOF v. NATHAN E. FISHER, ET AL.

**Appeal from the Chancery Court for Sullivan County**
**No. 29888(M)     John S. McLellan, III, Chancellor**

———————————

**No. E2004-00303-COA-R3-CV - FILED MARCH 28, 2005**

———————————

This appeal involves a dispute between the biological father, Brett W. Woodroof, who filed a petition to establish paternity of the nine year old child, Taylor Leigh Fisher, and the stepfather, Nathan E. Fisher, with whom the child has lived since she was two years old.  The trial court determined that Mr. Woodroof was the natural father and awarded him visitation rights, but did not award him custody.  A review of the record indicates that Mr. Woodroof asked for custody initially in his petition to determine parentage, but subsequently withdrew his request in his amended petition, and repeatedly advised the court throughout the lengthy court proceedings that spanned sixteen months that he sought only visitation with the child, and not custody.  Mr. Woodroof requested custody only at the end of the trial process, after the testimony of the medical experts and other persons had been presented, and after numerous assertions in court that he was not presently seeking custody.  We hold that his request for custody came too late and therefore we affirm the judgment of the trial court and remand for further action consistent with this opinion.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and CHARLES D. SUSANO, JR., J., joined.


Thomas F. Bloom, Nashville, Tennessee, for the Appellant, Brett W. Woodroof.

Mark D. Harris, Kingsport, Tennessee, and Phillip Larry Boyd, Rogersville, Tennessee, for the Appellee, Nathan E. Fisher.

Paul R. Wohlford, Bristol, Tennessee, for Intervening Petitioners, Robert R. Barnett and Carolyn Kay Barnett.

Polly A. Peterson, Johnson City, Tennessee, guardian ad litem for Taylor Leigh Fisher.

# OPINION

## I. Factual and Procedural Background

Brett W. Woodroof initiated this cause of action on July 9, 1999 by filing a petition to establish parentage of Taylor Leigh Fisher (hereinafter "Taylor" or "Child"), born February 17, 1996. According to the petition, Mr. Woodroof and the child's mother, Kimberly Barnett Fisher ("Mother"), met and dated in the mid-1980's. Mr. Woodroof joined the military and after his two years of service, he and Kimberly Fisher renewed their friendship. At that time, Kimberly Fisher was married to Nathan Fisher, but she told Mr. Woodroof that she and her husband were essentially separated and she had been dating someone else for a substantial period of time. Mr. Woodroof and Kimberly Fisher's relationship continued and during Memorial Day weekend in 1995, they engaged in unprotected sexual intercourse. Taylor Leigh Fisher was born approximately nine months later. Mr. Woodroof was not told of her birth until September or October of 1996 when in a telephone conversation, Mother told him she had given birth to a baby girl but she gave him an incorrect date for the birth of the child. Mr. Woodroof and Mother continued their relationship and spent the New Year's weekend together in 1997. Mr. Woodroof first saw Child in February of 1997 and was struck by Child's strong physical resemblance to himself. In the meantime, Mother and Nathan Fisher divorced in April of 1997 and Mother was awarded custody of Child subject to Nathan Fisher's visitation rights. Mother sent Mr. Woodroof a picture of Child in December of 1997, and again he noticed a "strong physical resemblance" between Taylor and himself. Thereafter, in 1998, Mother and Mr. Woodroof continued their telephone relationship and on several occasions, he confronted her about Child's parentage and she denied that he was Child's father.

On August 26, 1998, Mother committed suicide. Mr. Woodroof was a pallbearer at the funeral. While at the funeral home, Mr. Woodroof saw Child and became convinced that he was the father. After a short transition period when Child was apparently staying primarily with her maternal grandparents, she came to live with Mr. Fisher and his new wife, Tonya Fisher, in October of 1998. Taylor has continually lived with the Fishers since that time.

As noted above, Mr. Woodroof filed a petition to establish paternity of Taylor on July 9, 1999, requesting as follows:

> [T]he Plaintiff demands that the Court order the proper parties to undergo genetic testing pursuant to T.C.A. § 24-7-112; that upon a conclusive finding from such testing, the Court enter an Order declaring the Plaintiff to be the natural father of the child, Taylor Leigh Fisher; that the Plaintiff, upon such findings and Order be granted physical custody of the child and all rights, privileges and responsibilities of a natural father; that the child's name be changed to Taylor Leigh Woodroof, and that the Plaintiff be granted such other, further and general relief which the Court finds appropriate.

On August 21, 2001, the trial court entered an order appointing a guardian ad litem to represent the best interests of the Child. On August 22, 2001, the maternal grandparents, Robert R. Barnett and Carolyn Kay Barnett ("Grandparents"), filed a petition to intervene requesting custody of Taylor.

On April 15, 2002, Mr. Woodroof filed a motion to amend his petition to establish parentage, stating in relevant part as follows:

> For grounds in support of this Motion to Amend, the Plaintiff would show that his experts, Dr. Bernet and Dr. Lanthorn, have advised Plaintiff that it would not be appropriate for him to have full physical custody of Taylor Leigh Fisher at this time, and that he should only be granted visitation rights with said child at this time. . . Because of the opinions of Dr. Bernet and Dr. Lanthorn, Plaintiff seeks to amend his prayer for relief in his Complaint to Establish Parentage which was filed on July 9, 1999 *in order to seek appropriate parental access with Taylor Leigh Fisher, including only visitation rights with the child at this time and custody of the child in the future.* [emphasis added]

Two sets of hearings took place before the trial court. The first began on August 14, 2002, and continued on August 15, 2002, October 9, 2002, and December 11, 2002. Among the witnesses to testify were two psychiatrists, a clinical psychologist and a psychotherapist, all of whom had evaluated the Child. Although the experts were not in complete accord regarding their diagnoses, they all agreed that the Child suffers from very serious emotional and psychological problems. Evidence was presented that she has been diagnosed with Type I bipolar disorder by at least three psychiatrists.

The record contains a large amount of testimony regarding Taylor's behavioral symptoms, all of which need not be detailed in this opinion; but an example is provided by Dr. John Burke Robertson, Jr., Taylor's treating psychiatrist, who described what happened when she started kindergarten:

> A: She's had her ups and downs. She initially regressed severely with the beginning of school. It's kind of–the situation was such that she had maximal support and nobody was kind of bothering things, and then all of a sudden we put her into another environment that she was expected to perform at a level of another kindergartner, and she just couldn't do it, and she decompensated horribly at that time.
>
> Q: Just let me stop you a second.
>
> A: Sure.

Q: Could you explain to the Court, and to us, what decompensation is and what it means?

A: Sure. For Taylor's case, or anybody's case.

Q: Right.

A: Decompensation basically means a worsening of the psychiatric symptoms of behavioral disturbances, emotional symptoms that a person would have. And we usually reserve the word decompensate, meaning that it's pretty severe, as opposed to they had a small setback or there usually slight worsening of symptom back. to a severe state, maybe back to baseline, or even worse than baseline, before they were on medication.

           *              *            *

Q: And then after the decompensation, how would you characterize her psychotic condition?

A: Well, are you talking about during the decompensation?

Q: Yes, sir.

A: I mean, we–yeah. I mean, she blacked–during that time, she blacked teachers' eyes, smearing feces, scratching herself, pulling her hair out, biting herself, and biting peers. And, you know, of course they just could not manage her. I mean, the school system had to get involved, and they pulled her out. And we tried some home schooling, and we tried some things with medication, and she continued to do very poorly during that time, and eventually was psychiatrically hospitalized in November [of 2001].

On September 18, 2002, the Grandparents filed a "proposal for contact" between the Child and Mr. Woodroof, stating that "[t]his proposal has been generated by, and approved by the counselor, Laura Arnfield. . . and essentially tracks her recommendations." On September 20, 2002, Mr. Fisher filed a proposal for contact with Mr. Woodroof, which concurred in and adopted the Grandparents' proposal.

The trial court entered an order on February 21, 2003, establishing parentage and setting forth a visitation schedule for Mr. Woodroof. Based on DNA test results, the trial court declared Mr. Woodroof to be the biological father and established a schedule of gradually increasing visitation as follows in relevant part:

[T]he Plaintiff shall be granted visitation with Taylor Leigh Fisher in accordance with the Proposal for Contact submitted to this court by the [Grandparents], which. . .was generated by and approved by Laura Arnfield, Taylor Leigh Fisher's therapist. . .however, paragraph 2 of said Proposal for Contact is hereby modified so that Taylor Leigh Fisher will not start to be advised of the existence of Plaintiff until at least thirty (30) days after the birth of Nathan and Tonya Fisher's upcoming child, whatever date that is, with the timing to be in the sole discretion of Laura Arnfield. During the interim period between now and the time that Taylor Leigh Fisher is introduced to Plaintiff as her biological father, the Plaintiff and Nathan and Tonya Fisher shall meet with Laura Arnfield and start the process of learning how to handle things, how to discuss things, and how to be on the same page, so to speak, with regard to Plaintiff's introduction to and upcoming visitations with Taylor Leigh Fisher, and,

**IT IS FURTHER ORDERED,** that the Plaintiff's contact schedule based on said Proposal for Contact (as modified) at this time shall be as follows:

(a) That there will be no change of custody from the Defendant [sic], Nathan Fisher.

(b) That the introduction of the Plaintiff to the minor child as her biological father shall not start until at least thirty (30) days after the birth of Nathan and Tonya Fisher's upcoming child with the timing to be in the sole discretion of Laura Arnfield;

(c) That Laura Arnfield, and. . .Nathan Fisher, and his wife, Tonya Fisher, shall agree upon the presentation of the existence of the Plaintiff to the minor child.

(d) That there shall be a minimum of a six (6) week period of assessment and evaluation between each step of this proposal to determine how the minor child is adapting to each step.

(e) That step two shall be a time where the Plaintiff sends pictures, letters, telephone calls, e-mails, etc., to the minor child. During this time there will be a meeting with the Plaintiff and [Mr. Fisher] together to help the adults involved to be able to present a more unified front for the minor child.

(f) That step three shall be a short supervised visitation at the office of Laura Arnfield, lasting 1-2 hours on a weekly basis, or as determined by Ms. Arnfield. Before this step could occur, the Plaintiff would have to have met with his therapist, and the therapist and Ms. Arnfield would have communicated to insure continuity. This visitation would not take place at school, because the minor child needs to be able to function in school at a much higher level before any additional stress is added.

(g) That step four shall be longer weekly visits up to 4 hours still supervised by someone with whom the minor child is comfortable. This could occur at the babysitters' home or at the Defendant's home, with a family friend available. In addition, there should be a weekly phone call from the Plaintiff to the minor child.

(h) That step five shall be a short 2-4 hour unsupervised visit with the Plaintiff taking the minor child to places she is comfortable and familiar within the Tri-City, Tennessee, area.

(i) That step six shall be longer, unsupervised visits, 4-6 hours, still at places familiar to the minor child. During these visits, a meal would be shared between the Plaintiff and the minor child.

(j) That step seven shall be to go to 6-8 hour long visitations with two meals, occurring still in the Tri-City area.

(k) That steps two through four shall occur on a weekly basis for six weeks each. The six weeks will be consecutive not cumulative.

(l) That the Plaintiff; the Defendant, Nathan Fisher, and his wife, Tonya Fisher; the [Grandparents]; the minor child's school; the minor child's babysitter; the minor child; and Dr. Robertson will provide communication to Ms. Arnfield on the minor child and her progress. It is important that Ms. Arnfield assess the minor child's functioning to see if a move to the next level of visitation is possible, or whether the minor child has regressed and a move needs to be made backwards to a previous step.

      *        *        *

(n) That if severe regression or decompensation occurs, steps four through six should occur on a three week basis with step seven to go to a once a month status in addition to moving backward to the previous step.

(o) That Ms. Arnfield shall have sole discretion, as between the parties, in determining whether the minor child can move to the next proposed step, or whether there should be regression in the steps by reason of her level of functioning.

(p) That Dr. Robertson will be informed of every step and the reaction thereto; he will also monitor the minor child's situation as a treating physician. He alone shall have medical decision-making in this case.

      *        *        *

**IT IS FURTHER ORDERED,** that all parties shall follow Ms. Arnfield's recommendations, and if a party disagrees with Ms. Arnfield's recommendations, then a petition should be filed before this court, and this court will consider any of the concerns of any party in that regard.

The trial court named Nathan and Tonya Fisher as the residential parents of the Child. The court reserved several issues in the case, including method of payment of child support, Mr. Woodroof's request for a downward deviation of child support, and attorney fees and court costs.

This already difficult case became even more complicated when Mr. Fisher accepted new employment in March of 2003, requiring the Fisher family to move to Columbus, Ohio. Mr. Fisher apparently stayed in an apartment in Columbus until the end of Taylor's school year, when the family relocated. Laura Arnfield, Taylor's therapist, testified that due to the pending move, she proposed speeding up the process of telling Taylor about her biological father, which was done. Taylor learned of Mr. Woodroof's existence on or about April 18, 2003.

On April 29, 2003, Mr. Woodroof filed a petition in opposition to the move, requesting a restraining order prohibiting Mr. Fisher from removing Taylor from Kingsport. The petition further requested that Mr. Woodroof "be declared as having legal custody of his daughter," and as follows:

> That this Court's order of visitation in the state of Tennessee by the plaintiff be accelerated and that *upon conclusion of the visitation schedule*, that the Court review the issue as to whether or not the plaintiff should be declared the primary residential parent of his daughter and allow him to take her to his home in Nashville, Tennessee under whatever safeguards for her care, upbringing and necessary treatment the Court deems necessary. [Emphasis added]

On June 30, 2003, apparently shortly before the move to Columbus, a single face-to-face meeting took place between Mr. Woodroof and Taylor, with Ms. Arnfield present.

On July 30, 2003, Mr. Woodroof filed a motion requesting "that the court amend its Order of Parentage entered in this cause on February 21, 2003, to authorize Plaintiff's experts to reevaluate Taylor Leigh Fisher within the next 12 months for purpose of determining when it would be appropriate for Plaintiff to be awarded sole custody of his child."

On December 8 and 9, 2003, a hearing was held on Mr. Woodroof's motions and on the remaining issues that had been reserved in the court's prior order. In its memorandum opinion delivered at close of proof and incorporated into its final judgment, the trial court found that the relocation to Columbus was for a reasonable purpose,[1] did not pose a risk of serious harm to the Child, and was not done with vindictive motive. The court dismissed Mr. Woodroof's motion to have Taylor reevaluated by his experts as "prematurely filed," stating:

---

[1]Mr. Fisher testified that his salary increased from $91,000 to $155,000 per year as a result of the change in employment. Further, this increase allowed Mrs. Fisher to remain at home and take care of Taylor, which Ms. Arnfield testified was beneficial to her.

I find that based on Ms. Arnfield's testimony that the motion is not in the best interest of the child and is probably harmful to the child. I find it is counterproductive to the relationship between the parties necessary to allow a reasonable environment that would assist Taylor in developing the trust of the Plaintiff required to progress to a meaningful time-sharing arrangement. . .Now, by this ruling I'm not saying that there will not be an appropriate time in the future based upon the relationship developing and the trust developing between the biological father and this child that this motion might be appropriate, but based on the record I have today I find it is premature and I've said it is dismissed.

Mr. Woodroof appeals, raising the sole issue of whether the trial court erred in failing to grant him custody of his biological child. Mr. Fisher, the Grandparents and the guardian ad litem have filed separate briefs, each arguing that the judgment of the trial court should be affirmed.

## II. Standard of Review

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations which we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn.1995); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

## III. Analysis

In determining whether the issue of custody was properly before the trial court, a review of the statements made to the court by counsel for the parties is helpful. We begin by noting that Mr. Woodroof's amended petition specifically requested "only visitation rights with the child at this time and custody of the child in the future." At the beginning of the hearing, on the first day, counsel for Mr. Fisher stated to the court, without contradiction, "this isn't a custody case." The same day, Mr. Woodroof's own attorney asserted to the court, "custody's not even an issue right now. We're talking about the limited visitation period with the child." Mr. Woodroof himself testified as follows:

Q: Okay. Please explain to the Court what parental access you're seeking at this time with regard to Taylor Leigh Fisher.

A: I am requesting a graduated visitation that is being recommended by a professional that I've asked to look into this matter.

On October 9, 2002, the third day of the hearing, near the end of the day's testimony and after the medical psychiatric testimony had been heard, Mr. Woodroof's counsel reiterated that "this isn't a custody case at this point. We're asking for visitation." The trial court stated that "as I understand it, we're just dealing with timesharing and not with custody."

On December 11, 2002, after the close of proof as regards the initial set of hearings on the petition to establish paternity, Mr. Woodroof's counsel made the following statements to the trial court during closing argument:

> I think in terms of the–the main issue in this case is deciding whether Plaintiff should have parental access to Taylor in the form of visitation rights at this time. The secondary issue would be the economic support that my client should be required to pay for Taylor.
>
> \*       \*       \*
>
> [U]nder the *Ray v. Ray* case [83 S.W.3d 726, (Tenn.Ct.App.2001)], you know, he cannot be denied access to this child unless there's substantial harm. *And I think the experts have agreed that there would be substantial harm to the child if custody were transferred.* And I think that's something I think all the experts agree. *But we're not talking about transferring custody here. We're talking about visitation.* I think all the experts agree that Taylor should know about her biological father. [Emphasis added]

During the December 8, 2003 hearing, the following exchange took place between the attorneys and the court:

> THE COURT: There's not actually a present motion right now to alter the current order of parentage that we have and the provisions of that other than maybe modifying the–I guess, the information of the process or how Taylor's going to be informed of things. So I guess we can assume for today that, you know, the custody is not going to be awarded because it's not been asked for at this time.
>
> \*       \*       \*
>
> MR. HARRIS: [attorney for Mr. Fisher]: Your Honor, just a second. I just want to make sure we get in the record, because their motion, petition in opposition to removal, does ask that he be declared as having legal custody of his daughter. So if they're not asking for that, we need to make sure that's in the record–that that part of that motion is withdrawn.
>
> \*       \*       \*
>
> THE COURT: I assumed this was a prayer to accelerate the process so that he could–so that the biological father could take the child to Nashville. I guess, I'm assuming from reading that and under the

present state of the record then, the recommendations that he's not meaning permanently. I thought for time-sharing purposes. . .

MR. HARRIS: I just want to make sure, because in my reading of number 2, that's the way I read it. And that's the way everybody read it.

THE COURT: Mr. Chiles, are you all going to be presenting an expert that says–on that issue?

MR. CHILES [attorney for Mr. Woodroof]: Your Honor, no, sir.

THE COURT: Because I don't have a report from one, if you were. So you're not?

MR. CHILES: What this motion was–had to do with the objections of the removal to the state of Ohio.

THE COURT: Right. But you're not earnestly going to contend–if you're not going to have an expert in here, you're earnestly under the state of this record–from day one, you're not going to contend that and ask me to change physical custody to the biological father at this time, are you?

MR. CHILES: No, sir.

The next day, December 9, 2003, Mr. Woodroof's counsel stated the following to the trial court:

MR. CHILES: If Your Honor please, yesterday when I was presenting the petition in opposition to the Fishers' removal of the child, there was some confusion on my part, if Your Honor please, and I did not have a chance to consult with my client with regard to the issue of his requesting the Court to award him custody–legal custody of his daughter. And he would like to be able to just briefly state his request to the Court, knowing Your Honor's position on the thing on the case, and then we'll–that'll be the end of that. But I–we'd like to be able to put him on the stand for that purpose, if Your Honor please.

\*          \*          \*

THE COURT: I think when Ms. Arnfield was on the stand, I requested that myself to be sure there was a clear understanding so that we could elicit her opinion based on that position. So I don't–I don't accept the proposition that there was a misunderstanding.

-10-

There might have been a change of mind last night, but I think it was perfectly clear, and it's just a changing of the mind. So I don't accept your proposition. I think it was absolutely clear. It was asked once if not three times to be sure. So I don't see how it could be a mistake.

MR. CHILES: Well, if Your Honor please, I believe he did testify that when they read this paragraph in the petition that that was his position. He takes the position that–

THE COURT: You spoke for him as counsel when the question was specifically asked, and see what–and then Ms. Arnfield testified based upon his counsel's statement. And see, that could have changed her testimony or it might have generated more questions from Ms. Arnfield in response to what I assume now is his overnight position of wanting custody at this time. And, of course, she's not here now. So that could be prejudicial to the other parties in this case, and I just–I just don't accept your representation that he didn't understand.

The trial court allowed Mr. Woodroof to make an offer of proof at the conclusion of the hearing. He testified in relevant part as follows:

Q: Mr. Woodroof, you–are you asking that the Court declare you to have legal custody of your child?

A: Yes, I am.

Q: And what is the basis of your request, sir?

A: I feel that I have a constitutional right to custody of my daughter. That I am the only biological parent, the only living, biological parent to Taylor Leigh Fisher and that I feel that I have that constitutional right.

         *                 *                *

Q: . . .Mr. Woodroof, you were here back in December and prior to that at the other hearings, correct?

A: That is correct.

Q: And you presented two experts that you hired on your own at that time?

A: That's correct.

Q: And both those experts testified at the previous hearings that to transfer custody of this child to you at that time would cause substantial harm to the child?

A: At that time they testified to that. That is correct.

Q: As a matter of fact, all four experts who testified in this case, testified to that fact. Is that true?

A: At that time, they did. That is correct.

Q: Now, as we sit here today, do you have any evidence to present to contradict those four experts' testimony?

A: I do not have any evidence to contradict those four experts' testimony except for my testimony that I feel that I have the constitutional right to my daughter. . .

Q: Do you. . .

A: and I believe that that supersedes any medical experts' testimony.

As can be seen from the above excerpts, the trial court was faced with a request to consider custody as an issue only *after* six days of hearings spread over a period of some sixteen months, after numerous witnesses had testified and more than a thousand pages of their testimony had been transcribed, and after the court and opposing litigants had been repeatedly told that "custody isn't an issue in this case." Fundamental fairness supports the judgment of the trial court, which listened to and evaluated the proof under the impression that visitation was the issue being litigated. Mr. Woodroof's party opponents presented evidence and cross-examined witnesses under the same impression. *See In re Adoption of E.N.R.,* 42 S.W.3d 26, 32 (Tenn.2001)(stating "[w]e are of the opinion that there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all."). We find no error in the trial court's decision not to alter or amend its previous order designating the Fishers as having primary residential custody.

Further, while custody was not tried as an issue, expert testimony was elicited or developed on the potential effects of a change in custody, primarily because the experts generally testified that when Taylor discovered she had "another father," this knowledge would potentially be a source of fear and concern to her if she thought it raised the possibility that she would be removed from the only family unit she has ever known. As already quoted above, both Mr. Woodroof and his counsel readily admitted that the experts agreed that given Taylor's medical and psychological problems, a change of custody to Mr. Woodroof would cause substantial harm to her. All of the evidence regarding the Fishers' family indicates that they have provided a loving, nurturing and deeply supportive family structure for Taylor. It is significant in this case that Mr. Fisher, who was married

to Mother at the time of Taylor's birth, and who thought he was the biological father until DNA testing took place, is the only father Taylor has ever known.

While it is clear that Mr. Woodroof as the biological father has constitutional parental rights to a relationship with his child, *see, e.g., In re Adoption of Female Child (Bond v. McKenzie),* 896 S.W.2d 546 (Tenn.1995), we wish to make it clear that custody was not an issue in the case, pursuant to Mr. Woodroof's amended petition and his repeated statements to the trial court that, in effect, he was not *yet* seeking custody, but rather visitation only. Therefore, our decision does not affect custody of the child as between the parties. Mr. Woodroof's petition for custody may be heard in the future, if he chooses to pursue same, as an initial petition for custody with no requirement that he show a material change in circumstances, rather than a petition for change of custody.

Mr. Woodroof has not appealed the visitation schedule set forth by the trial court's order. He testified that "I would dearly like to follow the visitation schedule that was set up by this Court." The delay in implementing the visitation schedule has been lengthy and unfortunate, and it is time to begin that process. It is apparent, however, that since the Fishers' move to Columbus, Taylor has a new set of primary medical caregivers. Upon remand, the trial court is directed to amend its order to reflect the current reality of the identities of her current treating medical practitioners and her current therapists, and to grant the appropriate decision-making authority to the appropriate persons, keeping in mind Mr. Woodroof's constitutional right to attempt to foster a relationship with his biological child. Pending the trial court's review of the visitation schedule, we order that Mr. Woodroof shall have visitation with the Child for four hours each week under the supervision of Child's therapist, or the therapist's designee, for a period of eight weeks. If at the end of that eight week period, the trial court has not acted, then Mr. Woodroof's visitation shall increase to eight hours each week of unsupervised visitation in Columbus, Ohio.

### IV. Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed, and the case remanded with instructions to the trial court to amend its visitation order in accordance with the preceding paragraph. Costs on appeal are assessed to the Appellant, Brett W. Woodroof, and his surety.

_____

SHARON G. LEE, JUDGE