IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

**IN RE CHRISTIAN S.**

**Appeal from the Juvenile Court for Marshall County**
**No. 10JV24          Lee Bussart, Judge**

_____

**No. M2018-00128-COA-R3-JV**

_____

At issue in this appeal is the custody of an 8-year-old boy. On one side is his maternal grandmother and her husband, who have raised the child since he was one year old, pursuant to a court order placing him in their custody. On the other side is the child's father, who was incarcerated at the time the child was placed with his grandparents. When the father was released from incarceration, he filed a petition seeking visitation with the child; over the course of proceedings, he sought custody of the child. The juvenile court awarded custody to the father, holding that the he did not forfeit his superior parental rights and that the grandparents did not prove that the child would suffer substantial harm in the father's care and custody. The grandparents appeal; finding no error, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Randall W. Morrison, Tullahoma, Tennessee, for the appellants, James and Donna C.

Debbie L. Zimmerle, Lewisburg, Tennessee, for the appellee, Jordan R.

**OPINION**

**I. FACTUAL AND PROCEDURAL HISTORY**

On August 6, 2010, Lisa S., the mother of Christian, the child who is the subject of this proceeding, and Lisa's mother and stepfather, Donna C. and James C. ("Grandparents") initiated a proceeding in the Juvenile Court for Marshall County under

the style "IN THE MATTER OF CHRISTIAN [S.]," by filing a one page form entitled "Petition." The face page of the form reads, in pertinent part, as follows:

The undersigned Affiant, after being duly sworn according to the law, states that:

It being in the best interest of the child and the public that these proceedings be brought, your petitioner, [Lisa S and Donna and James C.], respectfully represents to the Court on information and belief that the above named, a child within this county and **1 yr.** of age, is a(n) **custody petition** (abandoned; dependent and neglected; traffic offender; unruly or delinquent) in need of treatment or rehabilitation in that:

PETITION TO TRANSFER CUSTODY
Your petitioners, Lisa S[.] (natural mother of Christian [S.]) and Donna C[.] and James C[.] (maternal grandmother and step-grandfather of said child) are requesting that custody of said child be transferred to Donna and James C[.]. Lisa S[.] is currently unable to provide for her child at this time and this is currently in the child's best interest. All parties do reside in Marshall County, Tennessee.

Your petitioner further avers:
That the child's father is **Jordan [R.]** residing at **currently incarcerated**.

At designated places on the face page, the clerk attested that summons issued, on August 9, for Jordan R. ("Father") to appear before the trial court on August 10 "to answer the charge of the foregoing petition, and to bring the above named child…." The clerk executed the Return of Service on August 9, stating that the petition was served on Father on August 9 "via fax to Marshall Co. Jail."

The reverse side of the form contains a STATEMENT OF RIGHTS advising the juvenile who is the subject of the proceeding of rights pursuant to Tennessee Code Annotated sections 37-1-131, -132, -134, and -137, and directing the juvenile to sign and acknowledge that he or she understands the rights and his or her parent or guardian to sign and acknowledge that he or she has been "fully advised as to the charges of the petition" and that "I have read the above statement concerning my child's rights in this case, that I understand these rights." The form also contains an entry for the judge to sign, attesting that the judge "certif[ies] that the above juvenile and his/her parent or guardian read or were advised of these rights." Lastly, the form contains a box entitled "Waiver – Right to Counsel" for the juvenile and parent or guardian to execute, attesting that he/she "understands that I have the right to have an attorney represent me in the hearing.…[that] I do not choose to have an attorney represent me in this hearing…." None of these entries on the form are signed.

2

The hearing on the petition was held on August 10, and the judgment was entered on the form. The judgment states "Upon agreement of all parties, custody of Christian [S. R.] is hereby awarded to Donna and James C[.]"; the judgment was signed by the Juvenile Judge; no other signatures are affixed to the form, and there are no factual findings or other statements on the form.

On July 25, 2016, Father filed a Petition to Establish a Permanent Parenting Plan, naming Lisa S. ("Mother") as respondent. The petition alleged the following facts:

1. That Petitioner was incarcerated until the __ day of April, 2016;

2. That prior to his incarceration, he had a relationship with the minor child and had an amicable relationship with the child's mother, Respondent;

3. That Petitioner desires to reestablish visitation between himself and the minor child and feels that it is in the manifest best interest of the minor child to have a relationship with her father;

4. That Petitioner faces no additional incarceration and has completed all required of him through probation and has been rehabilitated such that a relationship between himself and the minor child is of no negative consequence to the minor child;

5. That Petitioner is in a position and willing to accept full responsibility for the minor child, can provide a stable environment in which to rear the child, and feels it would be in the manifest best interest of the child if he were awarded visitation;

6. That upon information and belief, Respondent's Mother, Donna [], may have custody of the minor child, though Petitioner has no Order to that effect nor does an Order exist in the court file;

7. That no parenting plan has been previously established between the parties by and through the Court and that it is in the manifest best interest of the minor child that the Permanent Parenting Plan attached hereto as Exhibit "A" be adopted by this court; and,

8. That support has been previously set in accordance with the child support guidelines and Petitioner has no arrears and pays regularly and that should a modification be warranted per the child support guidelines, it is in the best interest of the minor child that such modification be ordered.[1]

---

[1] On January 18, 2017, Mother filed a *pro se* Answer to Father's petition in which she stated, "I think Jordan should be able to have visitation with Christian but not custody." She also stated that "Jordan and I signed over custody while Jordan was in jail." She ended her petition with the following plea:

I think that it is in the best interest of Christian to stay with Donna and James C[.] This is the only home he has known for his entire life. I also don't want to interrupt the routine or the stability of Christian. He is [in] a stable environment, likes his school, and is involved with sports, and I feel that it is in the best interest of Christian that he stays with James and Donna C[.]

3

In the proposed parenting plan attached to his petition, Father designated Mother as the primary residential parent, stated that he and Mother would have joint decision making responsibilities, and reserved all matters relating to residential parenting time, holiday schedules, and support.

Father filed a Motion for Pendente Lite Visitation and Support on July 26. An agreed order entered September 26 recites that "the parties have conferred regarding Petitioner's temporary visitation with the minor child" and had agreed that Father would have supervised visitation for an hour and a half every Saturday.[2] A hearing was held on November 18, at which Father and his counsel and Grandparents and their counsel appeared; an order entered January 18, 2017 recites that "the parties stipulated to a graduated visitation schedule being in the best interest of the minor child" and that "there was no need for continued supervision between the minor child and his father due to the child's comfortability with his father." The order set a visitation schedule for the upcoming holiday season, including one overnight visitation, and set another hearing for January 4, 2017 "to address continued overnight visitations." An order was entered on January 11, providing that Father would have overnight visitation every other weekend from Friday at 6 p.m. until Saturday at 6 p.m., and after a month, he would have visitation from Friday at 6 p.m. through Sunday at 6 p.m.[3]

On February 2, 2017, the Grandparents filed an Intervening Petition and Answer to Father's Petition. In their pleading, the Grandparents sought to remain the primary residential parents of Christian and averred that "While . . . it is in the child's best interests that he have visitation with his parents, and that he have a relationship with them, they disagree that it is in the child's best interests for a change of custody"; they also denied a material change in circumstances had occurred such that a change in custody was in Christian's best interest. Their pleading also stated that "By an Order of this Court, entered August 10, 2010 and 'by agreement of all parties' custody of the minor child was awarded to Intervening Petitioners. Petitioner Jordan R[.], who was incarcerated at that time, had been served by the Marshall County Sheriff's department and had notice of the hearing."

---

Mother participated in the hearings held in the juvenile court, but has not appealed any ruling by the court and is not a party to this appeal.

[2] The order was signed by counsel on behalf of Father and on behalf of Grandparents, whose counsel had filed a Notice of Appearance on their behalf as "Legal Guardians of the Minor Child, CHRISTIAN S.[ ]" on August 19. Mother did not sign the order either in person or by counsel and there is no certificate showing that she was served with a copy of the order.

[3] The orders entered January 11 and 18, 2017 were signed by counsel for Father and counsel for the Grandparents.

A hearing on Father's petition was held on June 30. Six witnesses testified: Father, Father's father, daycare provider Deborah McKee, Donna C., James C., and Mother. The trial court entered an order on August 17 in which it held that the August 2010 order granting custody of Christian to Grandparents "must be regarded as temporary due to the ineffective notice and lack of service of the Order to Father." The court then restored custody of Christian to Father and ordered that a time of "temporary transition" occur, with the parties rotating weeks until they returned to court; Mother's visits would continue during the time Christian was with Grandparents. The case was set for hearing on December 4 "for the court to review school records and, if necessary, hear additional proof to determine the pace of this transition."

On September 27, Grandparents filed a "Petition to Modify/Petition for Emergency Custody," alleging that, since the June hearing, "there has been a significant and substantial change of circumstance which would warrant this Court's immediate attention and consideration as to the continuation of [Father's] residential time" with Christian. Specifically, the petition alleged that Christian was "failing a number of subjects [in school] and having a difficult time staying awake while in the classroom" and that Father "has refused to administer" certain prescribed medications to Christian.

A hearing was held on November 30 and December 20 at which the following witnesses testified: Donna C., James C., Father, Father's father, Father's fiancée, Father's sister, Suzanna R., Christian's counselor, David Rutherford, Christian's teacher, Debra Hileman, and Christian's daycare providers, Patrick Ellison and Deborah McKee.

The court entered a Final Order on January 10, 2018, in which it held, in pertinent part, that Father retained his superior parental rights and fully restored guardianship and custody of Christian to him. The court also held that Christian would be subject to substantial harm if his Grandparents were barred from contact with him and, pursuant to Tennessee Code Annotated section 36-6-106(b)(1)(a), awarded them visitation every third weekend of the month, plus one week-long visit each year.

The Grandparents timely appealed to this Court, raising the following issues for our review:

1.) Whether the Trial Court erred in applying the superior rights of the parents' standard, as opposed to a material change of circumstance and best interest of the minor child, in changing custody from the maternal grandparents to the natural father.

2.) In the event the Trial Court is found not to have erred in the application of the superior rights of the father standard in this cause, your Appellants should have prevailed upon a showing that substantial and significant harm

5

came to the minor child and would continue if the Court granted residential placement to the natural father against the preponderance of the evidence.

Father raises one issue for review: "Whether the court erred in granting visitation rights to the grandparents when they had not filed a petition seeking visitation rights."

## II. DISCUSSION

Our resolution of the issues in this case requires that we make a threshold determination of whether Father forfeited his superior parental rights, a doctrine discussed by our Supreme Court in *In Re Adoption of Female Child*:

> In *Nale v. Robertson,* 871 S.W.2d 674, 680 (Tenn. 1994), the Court stated:
>
> > This Court found in *Davis v. Davis,* 842 S.W.2d 588, 600 (Tenn. 1992), that "there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights." This constitutional right of privacy includes parental rights.
> >
> > > In light of this right to privacy, we believe that when no substantial harm threatens a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit.
> >
> > *Hawk v. Hawk,* 855 S.W.2d 573, 577 (Tenn. 1993); *see also Broadwell v. Holmes,* 871 S.W.2d 471 (Tenn. 1994).
>
> Therefore, in a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

896 S.W.2d 546, 547-48 (Tenn. 1995); *see also In re Askew,* 993 S.W.2d 1, 4 (Tenn. 1999) (observing that "[t]he magnitude of a parent's constitutional right to rear and have custody of his or her children would necessitate a clear finding of substantial harm."); *Petrosky v. Keene,* 898 S.W.2d 726, 728 (Tenn. 1995).

In *Bryan v. Miller*, this Court considered the doctrine in a proceeding in which the mother of a child sought to regain custody of her son from his maternal grandmother; we stated:

> It is well-settled under existing Tennessee jurisprudence that "the Tennessee Constitution protects the fundamental right of natural parents to have the care and custody of their children." *Blair v. Badenhope*, 77 S.W.2d 137, 144 (Tenn. 2002) (citations omitted), *superseded by statute on other grounds as recognized in Armbrister v. Armbrister*, 414 S.W.3d 685 (Tenn. 2013). Persons who are not a child's biological parent, however, do not have the same constitutionally protected interests as are possessed by a biological parent. *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). Indeed, "when faced with competing custody claims by a biological parent and a third party, the courts must favor the biological parent." *Id.* In initial custody proceedings, the natural parents simply have superior rights in relation to non-parents who are seeking custody. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 811 (Tenn. 2007) (citation omitted). If a parent retains his or her superior parental rights, the parent cannot be deprived [of] the custody of a child "unless there has been a finding, after notice required by due process, of substantial harm to the child." *In re Adoption of Female Child*, 896 S.W.2d 546, 548 (Tenn. 1995). "Only then may a court engage in a general 'best interest of the child' evaluation in making a determination of custody." *Id.* In light of the constitutional protections afforded to natural parents, "the burden is on the non-parent to establish by clear and convincing evidence that the child will be exposed to substantial harm if placed in the custody of the biological parent." *Sikora ex rel. Mook v. Mook*, 397 S.W.3d 137, 143 (Tenn. Ct. App. 2012) (citations omitted).

No. M2015-00550-COA-R3-CV, 2016 WL 4249291, at *8 (Tenn. Ct. App. Aug. 8, 2016). Of particular relevance to this case, we noted:

> The above evidentiary standard does not typically apply, however, when parents seek to modify a valid order placing custody with a non-parent. As a general matter, parents are not entitled to invoke the doctrine of superior parental rights under such circumstances. Rather, the trial court "should apply the standard ... applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." *Blair* [*v. Badenhope*], 77 S.W.3d [137,] 148 [(Tenn. 2002)] (citation omitted). This is true even if the initial award of custody to the non-parent was the result of the natural parent's decision to voluntarily cede custody of the child. "[T]he parent's voluntary transfer of custody to a non-parent, with knowledge of the consequences of that transfer, effectively operates as a waiver of [superior parental rights]."

7

*Id.* at 147. Exceptions do exist, however, and the fact that a non-parent has been awarded custody of a child does not necessarily prevent a biological parent from successfully asserting superior parental rights in a proceeding to regain custody of the child. For example, if a natural parent was not afforded an opportunity to assert superior parental rights in the initial custody proceeding, those rights should not be considered to be forfeited. *See id.* at 148. The Tennessee Supreme Court has identified four circumstances in which a natural parent retains a presumption of superior parental rights as to custody:

> (1) when no order exists that transfers custody from the natural parent;
> (2) when the order transferring custody from the natural parent is accomplished by fraud or without notice to the parent;
> (3) when the order transferring custody from the natural parent is invalid on its face; and
> (4) when the natural parent cedes only temporary and informal custody to the non-parents.

*Id.* at 143.

2016 WL 4249291, at *9.

The trial court held that the August 2010 order granting custody of Christian to Grandparents "must be regarded as temporary due to the ineffective notice and lack of service of the Order to Father." Grandparents contend that Father forfeited his superior parental rights when:

> [A]ll intended parties were before the court when the custody was granted to [Grandparents] and upon the fact that the natural father stated, at that time, he didn't care and allowed custody of the minor child to go unchallenged for a period of some six (6) years before addressing visitation in a Petition to Establish Permanent Parenting Plan.

We do not agree with Grandparents' argument; the court's holding is supported by the evidence, and the evidence cited by the Grandparents does not preponderate against the finding.

Pertinent to this issue, Father testified as follows:

Q. Okay. Now, Jordan, let's go back to 2010. You were incarcerated down here at the Marshall County Jail. Do you recall a day when you were

brought to the courthouse and asked anything about Christian?

A. Yeah. I recall it. Yes.

Q. Okay. Can you tell the Court what you recall about that day?

A. I honestly thought I was going for other charges.

Q. Okay.

A. I didn't know what it was about and no one really knew what was going on. And when they brought me into the courtroom, you know, he -- you know, the Judge brought me up to the podium and said, Hey, you know, this is what is going on. I need you to sign your rights over. And I told him No, you know, I said, because one day this will all be behind me. Regardless of the fact, he's my son, you know. And he didn't like that too much, so they just took me back to the jail.

Q. Okay. Had you been given any paperwork prior to being brought over to the courthouse that day?

A. No. And if I would have, my parents would have been involved.

Q. Okay.

A. Lawyers would have been involved. I didn't have any kind of, you know, warning about this at all. It was just, hey, you know, you got to go to court is basically all it was.

Q. And so no one handed you paperwork at the jail. Did anyone hand you any paperwork when you got to the courthouse?

A. No.

Q. Okay. When you were brought up to the bench did the Judge show you any paperwork and explain to you --

A. No. He just said this is what is going on, you know. [Mother] has surrendered her rights. We're asking you to do the same.

Q. Okay. Had [Mother] or Mr. and Ms. C[.] come and talked to you at the jail about what their intentions were?

A. No.

Q. Okay. When you were brought before the Court, were you offered an opportunity to be appointed an attorney?

A. No.

Q. Okay. Were you offered an opportunity to have the court date set at a later time?

A. No.

Q. Were you placed under oath?

A. No.

***

Q. All right. Now the day that you were in court, after that day what -- I am sorry. Let's go back. The Judge brought you to the podium, and after you told him what your opinion was, what happened after that?

A. He was pretty upset.

Q. Okay. All right.

9

A. I mean, he was pretty demanding about it, and at that particular point in time, you know, I didn't really care, because I was upset. You know, when I'm sitting there trying to tell you that one day this will all be behind me, regardless of the fact, this is my son, and I said what I said to him, he just said, Get him out of here.

Q. And so you were removed --

A. Yeah, I was.

Q. And where were you taken?

A. Back to the jail.

***

Q. Okay. All right. Were there other prisoners or inmates that were brought over with you that day?

A. Not with me. They were already there.

Q. Okay.

A. Like I said, I didn't even make it back to where they hold the prisoners. It was -- when I walked in, they had me come up to the podium and then --

Q. So you were brought in a car. You were brought up to the podium?

A. Yeah.

Q. Never put in that holding room to the side?

A. No. No, ma'am.

Q. I see. And then and go ahead. I am sorry. I interrupted you.

A. And it -- you know, he was -- like I said, he was pretty demanding about it. He asked me a few times and I just kept telling him no. And then, you know, the last one was, you know, You can kiss my -- and then that was that.

Q. Okay. All right. And that's when they removed you from the courtroom?

A. Yeah.

Q. Did you ever, after that, receive any paperwork from the Court?

A. No.

There is no countervailing testimony.[4]  The only other proof pertinent to this issue is the August 2010 petition.  As noted earlier, the August 2010 judgment disposes of the case by simply checking the box labeled "Other" and then stating that "Upon agreement of all parties, custody of Christian S[.] R[.] is hereby awarded to Donna and James C[.]"At no point on the form does it affirmatively appear that Father was given prior notice of the nature of the proceeding, an opportunity to consult with counsel and/or to assert his superior parental rights, or that he was made aware that any statement he made

---

[4] Grandmother also testified relative to the August 10, 2010 hearing; her testimony does not contradict Father's testimony in any respect.

or action he took could lead to the forfeiture of his superior parental rights. The absence of Father's signature anywhere on the form petition supports his testimony.[5]

The proof is neither clear nor convincing that Father voluntarily transferred custody of Christian to Grandparents with knowledge of the consequences of that transfer or that he intended in any respect to forfeit his superior parental rights. *Blair* at 147. We therefore affirm the trial court's holding that Father retained his superior parental rights to Christian and conclude that the court applied the proper evidentiary standard when it required the Grandparents to prove, by clear and convincing evidence, that returning Christian to Father would result in substantial harm to the child. *In re Adoption of Female Child*, 896 S.W.2d at 548 (Tenn. 1995).

In their second issue, the Grandparents assert that the court erred in determining that they did not prove that substantial harm would come to Christian if he were to be placed in Father's custody.

Our standard of review of this issue was stated by this Court in *Bryan*:

Because the heightened burden of proof in this matter differs from the customary evidentiary standard applicable to most civil cases, we must adjust our usual standard of review in determining whether error was, in fact, committed with regard to [the child]'s custody placement. *Ray [v. Ray]*, 83 S.W.3d [726] at 733 [(Tenn. Ct. App. 2001)]. We begin by presuming the trial court's factual findings to be correct, unless the evidence preponderates otherwise. *In re Caleb B.*, No. M2013-02564-COA-R3-JV, 2015 WL 1306755, at *3 (Tenn. Ct. App. Mar. 19, 2015) (citations omitted). Considerable deference is given to the trial court's findings in regard to witness credibility. *Id.* Then, however, we must proceed to determine "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that the child would be exposed to substantial harm if placed in the parent's custody." *Id.* (citation omitted). "The 'clear and convincing evidence standard' is more exacting than the 'preponderance of the evidence' standard." *In re Emmalee O.*, 464 S.W.3d 311, 323 (Tenn. Ct. App. 2015) (citing *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)). Evidence satisfying the clear and convincing evidence standard should eliminate "any serious or substantial doubt concerning the

---

[5] Moreover, the petition states that Mother was "currently" unable to care for the child, that Father was "currently" incarcerated, and that placement with the maternal grandparents was "currently" in the child's best interest. The use of the word "currently" indicates that the parents' situations were temporary, and the lack of details in the petition or findings in the judgment support a conclusion that the fourth circumstance announced in *Blair* — that the natural parent cedes only temporary and informal custody to the non-parents — would apply. 77 S.W.3d at 143.

correctness of the conclusions to be drawn from the evidence." *Id.* at 323-24 (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

As a result of the variability of human conduct, the circumstances that pose a risk of substantial harm to a child are not capable of precise definition. *Ray*, 83 S.W.3d at 732. In general, however, the use of the modifier "substantial" suggests two things:

> First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Id.* (internal footnote omitted). In order to determine whether a parent poses a risk of substantial harm, courts may inquire into a person's fitness as a parent. *In re Caleb B.*, 2015 WL 1306755, at *5 (citation omitted).

*Bryan*, 2016 WL 4249291, at *11-12.

In the order awarding custody of Christian to Father, the court did not make an explicit finding that Christian would not be subject to substantial harm in Father's home; it found that "both homes are appropriate." In its oral ruling, the court stated that "if this were a contest and the legal standard were whose house was -- who was the better fit between the 2 of you, there is no doubt the C[.]'s have more stability[,] but that is not the legal standard." It is clear from the context of the court's statements and its order that the court concluded that Christian was not at risk of substantial harm in Father's care. Upon our review of the entire evidence on this issue, summarized below, and according the trial court the deference we give in its consideration of such matters, the record does not preponderate against the court's findings and its determination that the matters complained of by Grandparents did not subject Christian to substantial harm for purposes of placing him in their custody.

On appeal, the Grandparents contend that the "increase in parenting time, or visitation, to the natural father was resulting in substantial harm to the minor child." In support of their position, they cite to evidence that shows: (1) that Christian was failing three subjects at school, not attending school at times, and taking little interest in school since he began alternating weeks of visitation at his Father's home; (2) that Father did not communicate frequently with the school regarding Christian's educational welfare; (3) that Christian was experiencing behavioral issues, specifically depression and exhibited a disrespectful attitude; (4) that Father did not become involved in Christian's counseling;

(5) that Father initially failed to give the child his medication for attention deficit disorder, depression, and Tourette's; (6) that Father is unemployed; (7) that there was "trouble" among the residents of Father's home; and (8) that Father failed to notify the Grandparents that a spacer had come out of Christian's teeth.

We have reviewed the testimony from the hearings in this matter and summarize that which is relevant to the Grandparents' areas of concern.

### (1) Christian's Academic Performance

Christian's teacher, Ms. Hileman, testified that "[h]e's a very sweet boy, very apologetic, but he has trouble . . . following rules." She also testified that his grades are "very, very low"; that he is "lacking motivation" and "seems distant"; and that "[o]ut of the four subjects, three of them are failing."

Father testified that he is aware that Christian is failing three subjects and is concerned; that "we have a schedule that we go by at the house when it comes to Christian[:] . . . an hour and 20 minutes of homework every night regardless of the fact if he doesn't have some, he's going to read a book for at least a half an hour"; that when Christian is with him, someone is going over his schoolwork with him "[e]very day"; and that he permitted Christian to miss school for one day "[b]ecause he said he wanted to spend a little time with me, just him and I, and I didn't see -- he was in a mood, you know, and I didn't want to upset him and so I agreed to spend the day with him." Father also testified that Christian has been late for school three or four times, that he helps Christian with his homework every day, and that his grades have been improving a little bit.

Father's father testified that he occasionally takes Christian to school and that he has been tardy once. Father's fiancée testified that Christian missed school one day because he said he was sick but "we knew there was nothing wrong with him [and that h]e was just giving us a hard time."

### (2) Father's Communication with School Staff Regarding Christian

Father testified he spoke with Christian's teacher during a fundraiser at a fast food restaurant on one occasion for "about 45 minutes" and that he has spoken with "a couple of different people at the [school's] office."

### (3) Christian's Emotions and Behavior

David Rutherford, Christian's counselor, testified as an expert in psychology on November 30, 2017. He testified that he had been seeing Christian for nine months for behavioral and mood problems and that he had not met Father. Mr. Rutherford recounted

13

that in their March 2017 sessions, Christian "seemed to be genuine" and "d[id]n't want to live with his father[, which i]s giving him a lot of anxiety" and that Christian "needs stability" and that "back and forth, and back and forth, and back and forth like a ping-pong ball I don't think is stability, and that just brings on agitation, and anxiety, and uncertainty." When asked what danger or damage would come to Christian if he was in Father's home all the time, Mr. Rutherford answered, "I think his anxiety would go up, . . . his depressions would increase[, and] . . . his behavior would . . . deteriorate further." Mr. Rutherford testified that he worked with Christian "to try to get him to express" that "[h]e did not want to go to Dad's" and he helped Christian write a letter expressing his feelings.[6]

Father, who had testified in previous hearings that he had been adopted, testified as follows:

> Q. Okay. You heard, let's see, Mr. Rutherford testify earlier that Christian needs stability. Would you agree?
> A. Absolutely.
> Q. What do you think Christian needs right now?
> A. I think he needs his father, honestly. And that's exactly what he needs. I mean, that's all I can say. I mean, this is really unstable. I completely agree, and no one knows any better than I do how that can make you feel --
> Q. Uh-huh.
> A. -- you know. But this, all that's going on right now, this is unfunctional. This is not any way to try and do anything. It never has worked, and it probably never will work.

Father also testified as follows relative to Christian's emotions and behavior:

> Q. When Christian first started coming to you, did you have the behavioral issues out of him then that you have now?
> A. No, and, honestly, I -- I don't want to blame myself, but when this all started, we'd go out on the weekends –
> Q. Uh-huh.
> A. -- and we would always -- it was summertime, we would always find something, so, of course, we'd stop at the store first. "Okay. Well, what do you want to do? Do you want to play tennis," anything like that. So every weekend we ended up buying him something. And it wasn't intentional, you know, it was just how it kind of fell into the -- the whole role of things.
> Q. Uh-huh.

---

[6] The record does not show that Father ever received the letter; Father testified that he received another letter from Christian expressing his love for Father. Both letters were introduced into evidence.

A. And I think when he started staying the night with us and the more he got comfortable, the more things he would ask for, and I -- and I would tell him, "Not right now, man. You know, if you want that, you can earn it."

Q. Un-huh.

A. "You know, let's get them grades up," or, "You know, you can come help me in the yard or something," anything of any nature, you know. But when I started telling him no, he -- he got really defiant.

Father testified that since the June 2017 hearing, Christian had become a "bully" and was "very mean" and "too rough" toward pets and violent towards Father when Father had put him in timeout. Father also testified that the Grandparents had purchased a cell phone for Christian and that he does not approve of Christian having it, due to the inappropriate websites Christian was able to access with the phone. Father testified that he had caught Christian stealing. At the December 20 hearing, Father testified that recently, Christian's behavior at home was improving and that Christian is "just happy," "lovable," and that his "demeanor and everything has changed completely."

Grandmother testified that prior to the week-on, week-off visitation schedule, Christian was a "very, very happy child" and a "lovable kid," but that he had "changed drastically," i.e., he "has no will," "doesn't want to try to do anything," and "[h]is depression is absolutely off the charts." Mr. C. testified that Christian "was outgoing and very happy" but is now "depressed and sad" and that he and his wife are "very concerned" about him.

Christian's daycare provider Patrick Ellison testified that he has known Christian for years, and that "the biggest change" in Christian over the previous months was that "he has lost his smile." Mr. Ellison testified that Christian was previously "one of the happiest kids in our whole center" and that "[h]is smile can light up a room, and it is not there any longer." Deborah McKee, who owns the daycare facility that Christian has attended since he was 2 years old, testified as follows:

[When] children don't know what is going to happen, or they are afraid of something that is going to happen, it shows through their emotions, either crying or anger. Christian is showing both of those. He will cry and ask to stay inside with me sometimes. He will get mad at other kids and have to sit in timeout just to collect his feelings.

… The last several months you will see him sitting at the table and just he is in a daze. He does not -- like he is trying to figure out his world. He will just sit there quietly and just not in a daze, just by himself. He is inside his head.

15

Ms. McKee also recounted one incident where he was using foul language and another where he had "a meltdown" and refused to get on the school bus.

Father's father testified about Christian's recent behavioral issues, saying that "the most difficult one to deal with is the lying" and that aggression has also been an issue: "[u]sually he is aggressive with the dogs." However, he testified that recently, Christian has been "getting along well with everybody." He testified that he does not hear Christian curse much but that he corrects Christian when he hears him use curse words.

Father's fiancée testified that Christian's behavior and attitude were initially good but then became "really awful," specifically that he "didn't want to listen" though in "the last few weeks, he has been really good again." She testified that Christian is punished for bad behavior by being put in time out or taking away "the game systems" or making him sit in his room and read a book."

### (4) Father's Involvement in Christian's Counseling

Father testified that he found out about Mr. Rutherford at the November 30 hearing and, between that date and the date of the next hearing, he attempted to attend one of Christian's counseling sessions but was late; he did not talk to Mr. Rutherford because "he seemed like he was in a hurry to just get back to whatever he was doing." Father testified that he planned to "set up an appointment with that doctor [sic] so I can speak to him about the situation."

### (5) Father's Failure to Give Christian His Medication

Father testified at the June 30 hearing that he was not "given a background" on the medications and blamed a lack of communication with the Grandparents for his failure to understand why Christian needed the pills. He also testified that when visitation first began he didn't have to give Christian his medications because Grandmother "medicates him . . . before he comes to our house." As visitation had increased, he testified as follows:

> Q. You said he was -- he comes to your house with a bag of pills. Are these pills in little prescription bottles?
> A. No. They're just in the bag and, you know, take this one in the morning, take this one, two at night, you know. And I -- honestly, I think -- what I've experienced -- I was giving him the medication, but I noticed that he wasn't, I guess you would say acting like a child. He was just – didn't really want to do anything, kind of moped around.
> Q. Did you understand that these were prescribed medications?

16

A. Yes. I understand that, but for what? I wasn't given a background on them. I wasn't, you know, even offered to go to the doctor, you know, if -- you know, anything like that. I wasn't told anything.

At subsequent hearings, he testified that he was told that Christian takes medication because "he has a tick, … has depression, and anxiety." Father also stated that he does not have a problem with Christian being on medication if he needs it. He further testified:

Q. . . . [H]ow do you know that those are the medications that he's prescribed?
A. I looked them up. . . . on my own, to make sure that I wasn't being fooled around or anything like that so I wouldn't hurt the child, because I didn't -- they didn't have a label at first or anything, I looked them up. That's how I knew.
Q. So it didn't have a label so –
A. It was just in a bag.
Q. -- how -- it was given to you in a bag. Like in a Ziploc bag?
A. Yeah.
Q. No prescription bottle?
A. No.
Q. Does -- does Christian get his medication?
A. Yes. The boy gets the medication at the house.
Q. Is there any issue -- has there been any issue with him getting his medication?
A. The only issue is sometimes in the morning it's a little late, but other than that, and we're not talking a couple of hours or anything like that, we're -- I mean, sometimes it's just, you know, "We forgot, we need to get it," you know. But other than that, it's not -- never been a big issue.

### (6) Father's Employment Status

With respect to Father's employment status, Father testified that he receives $900 a month from an "allowance" and from his side jobs in welding and fence installation. He also testified that due to his father's recent heart attack, Father was currently unemployed so that he could "look after [his] dad."

### (7) Father's Home

With respect to Father's home, Grandmother testified that Father "has a very bad temper" and that Christian had told her, after using curse words while playing a videogame at her home, that "[Father] lets [him] say them." She also testified that she picked up Christian's backpack from him at school when Christian is going to spend the

week with his Father "because of the awful smell of stuff that comes home from [Father's]. . . It smells like smoke. I have a jacket in there that smells like urine and he is sending Christian to school with that stuff."

Father testified that the home is "cluttered" and he is in the process of "redoing floors, bathrooms." Father's fiancée testified that "I am not going to say it is the best house, there is damage"; that they are making repairs by replacing the flooring and old, leaky windows, and repainting, and, though there is "a bunch of clutter" and "a bunch of laundry that's stacked," that it is not dirty, and that "there is nothing wrong with the house."

With respect to any "trouble" among the residents of Father's home, Father testified that the following people live in the home: Father, Father's father, Father's fiancée, Father's daughter, Father's brother, and Father's former foster brother Michael, and on occasion, Father's sister Suzanne. Father's fiancée testified that she and Father have been together six or seven years and that she considers some family members, specifically, Father's sister Suzanne, to be "gypsy"-like, in that they do not stay at the home for a long period of time.

### (8) Christian's Dental Health

Grandmother testified that a spacer came out of Christian's mouth and Christian told her about it over the phone. She testified that she never had a conversation with Father about it. She testified that she was able to set up an appointment with Christian's dentist to have it replaced, and Christian was without the spacer for "a week or a week and a half."

Applying the standard of review as set forth previously, upon our review we have determined that the record does not "provide clear and convincing evidence that [Christian] would be exposed to substantial harm] in Father's custody. *Ray,* 83 S.W.3d at 733. Perfection in parenting is not the standard. *Id.* at 734 (noting that "[b]iological parents are not required to prove that they are perfect in order to be granted custody."). The concerns expressed by the Grandparents, discussed above, were addressed by the court in the provisions included in the order relating to the "comings and goings of relatives into the home," Christian's ability to play "age- appropriate" video games, the use of foul language, smoking, gun safety, and Christian's school attendance.[7] Accordingly, we affirm the custody order in its entirety.

Father contends that the trial court erred in granting visitation rights to the grandparents *sua sponte* because they did not ask for visitation rights in a motion they

---

[7] We note also the court's acknowledgement of responsibility for the length of the transition and its recognition that the delay allowed for Christian to manipulate the parties.

filed after the court entered the order restoring Christian to Father's custody and establishing a rotating visitation schedule between Father and Grandparents to assist in the transition. This contention is without merit. The grandparents had custody of Christian for the majority of his life; after Father filed his initial petition to establish the parenting plan and, later, to be granted custody of Christian, the Grandparents filed numerous pleadings seeking custody of Christian. In the August 17, 2017 order, the court found that "a significant relationship exists between [Grandparents] and [Christian] due to the length of time [Christian] has been in their care…cessation of the relationship…would result in substantial risk of harm to the child"; this finding was repeated in the final order and has not been appealed by Father. Under these circumstances, we find no error in construing the Grandparents' pleadings to include a claim for grandparent's visitation rights, as provided in the Grandparent Visitation Statute, Tennessee Code Annotated sections 36-6-306 and -307.

While this appeal was pending, Father filed a Motion to Suspend Grandparent Visitation in the trial court, to which Grandparents responded. Grandparents also filed a Petition for Custody, to which Father filed a counter-complaint asking that Grandparents' visitation rights suspended. The trial court held a hearing on both matters and dismissed both. Grandparents thereafter moved that this Court expedite the disposition of this appeal and consider as post-judgment facts the events giving rise to the petition they filed in the trial court and the court's action thereon. We entered an order reserving the motion pending completion of the briefing schedule and oral argument, if requested. Upon consideration, the motion to consider post-judgment facts is denied. Inasmuch as Grandparents assert that an order was entered dismissing the petitions the appropriate manner of review would be to file a notice of appeal of the order for which review was sought. In the absence of same, this Court does not have jurisdiction of matters arising in the trial court after the notice of appeal is filed.

III. CONCLUSION

In light of the foregoing analysis, we affirm the judgment of the trial court and remand for further proceedings as may be necessary.

_____
RICHARD H. DINKINS, JUDGE